Approved by the Governor—January 2, 1968.

Filed in the Office of the Secretary of State—January 2, 1968

**BLODGETT UNCRATED FURNITURE SERVICE, INC., a corporation, Plaintiff,**

**v.**

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

**North American Van Lines, Inc., Intervening Defendant.**

**Civ. A. No. 5444.**

United States District Court
W. D. Michigan, S. D.

Sept. 6, 1968.

592

Warner, Norcross & Judd, Grand Rapids, Mich., Johnson, Peterson, Tener & Anderson, Jamestown, N. Y., for plaintiff; J. M. Neath, Jr., Grand Rapids, Mich., Kenneth T. Johnson, Jamestown, N. Y., of counsel.

Donald F. Turner, and John H. D. Wigger, Asst. Attys. Gen., Dept. of Justice, Washington, D. C., Harold D. Beaton, Dist. Atty., Grand Rapids, Mich., for the United States.

Robert W. Ginnane and John E. Faulk, Washington, D. C., for the Interstate Commerce Commission.

Martin A. Weissert, Fort Wayne, Ind., Hillman, Baxter & Hammond, Grand Rapids, Mich., for North American Van Lines, Inc., Douglas W. Hillman, Grand Rapids, Mich., of counsel.

Before EDWARDS, Circuit Judge, and THORNTON and FOX, District Judges.

## OPINION

FOX, District Judge.

This is an action to review, enjoin, suspend, annul and set aside an order of the Interstate Commerce Commission, Operating Rights Review Board Number 3, denying plaintiff's application for elimination of certain gateways. This court has jurisdiction pursuant to 49 U.S.C. § 305(g) and (h), 28 U.S.C. §§ 1336, 2284, 2321-25, and Section 10 of the Administrative Procedure Act, 5 U.S.C. §§ 702-706.

On January 14, 1965, plaintiff filed an application with the Interstate Commerce Commission seeking a certificate of public convenience and necessity authorizing operation in interstate commerce as a common carrier by motor vehicle of uncrated new furniture over irregular routes, (1) from Grand Rapids, Lowell, Otsego, and Holland, Michigan to points in Virginia and West Virginia; (2) from Chicago, Illinois to points in Virginia and West Virginia; (3) between points in North Carolina on one hand, and Illinois, Michigan, Indiana, Ohio, Jamestown, New York, and Pittsburgh, Pennsylvania, on the other; and (4) between points in Maryland on the one hand and points in Indiana and Michigan on the other.

The following statement of facts is taken from the Report and Order recommended by the Hearing Examiner, Allen W. Hagerty:

Applicant is a motor common carrier engaged predominantly in the transportation of uncrated new furniture with operations extending into Michigan, Illinois, Indiana, Ohio, Pennsylvania, New York, Maryland, Iowa, Minnesota, Missouri, New Jersey, Connecticut, Massachusetts, Rhode Island, Wisconsin, North Carolina, Virginia, West Virginia and Delaware. It presently holds authority to transport new furniture uncrated between the points here involved in the instant application but to do so must observe certain gateway points which results in circuitous routes. As an example, applicant may transport new furniture over irregular routes between Grand Rapids, Lowell, Otsego and Holland, Mich., on the one hand, and, on the other, St. Louis, Mo., and points in Illinois, Indiana, Ohio, Pennsylvania, New York, Maryland, and the District of Columbia and between Chicago, Ill., on the one hand, and, on the other,

points in Indiana, Michigan and Pennsylvania. Among other it also may transport new furniture between Chicago on the one hand, and, on the other points in Maryland and between Chicago and Grand Rapids on the one hand, and, on the other, points in North Carolina, and from points in Warren County, Pa., to points in Virginia and West Virginia. Under its present authority furniture moving from Chicago, Grand Rapids, Lowell, Otsego and Holland, Mich., to points in Virginia and West Virginia (parts (1) and (2) of the application) presently must move through Warren, Pa. Shipments moving between points in North Carolina on the one hand, and, on the other, points in Illinois, Indiana, Michigan, Ohio, Jamestown, and Pittsburgh, (part (3) of the application) must move through either the Chicago or Grand Rapids gateways; and shipments moving between points in Maryland on the one hand, and points in Indiana and Michigan on the other (part (4) of the application) must move through the Chicago gateway. Operation between these points through these gateways entails additional expense and exposure to highway hazards. Applicant here seeks to eliminate these gateways but does not propose to change its present pattern of service transit time-wise. At the time of the hearing applicant operated 58 tractors, and 23 trucks. For the most part these tractors are leased from owner-operators. Applicant also operates about 68 trailers, the majority of which are company-owned. These trailers include trailers especially designed for the transportation of uncrated furniture which are of the high cube type equipped with racks at different levels for the proper stacking and loading of uncrated furniture. As of December 31, 1964 applicant had assets of $514,370 which included current assets of $194,279, and fixed assets, including revenue equipment, valued at $178,532 after depreciation. Its current liabilities amounted to $58,-

499 and it had an earned surplus of $210,238. Applicant maintains a comprehensive safety and maintenance program and at hearing time appeared not to be in violation of the Interstate Commerce Act or the Commission's rules and regulations thereunder. Applicant is fit financially and otherwise to conduct the proposed motor carrier operations.

Applicant's service is principally less-than-truckload. Its mode of operation is to spot trailers at the shipper's plants or make pickups of less-than-truckload shipments, consolidate this traffic into truckload quantities and normally moves the traffic over the weekend to destination providing about a 60-hour service between the points here involved. Applicant's exhibit No. 2 shows that from January 16, 1964 to November 24, 1964 it handled 15 shipments of new furniture from Grand Rapids, Holland, Lowell, Otsego to points in Virginia, West Virginia via the Warren gateway. There were 44 shipments from Chicago, Ill., to points in these two States through this same gateway from January 8, 1964 through December 14, 1964. Shipments moving from points in North Carolina to points in Illinois, Indiana, Michigan, Ohio, Jamestown, and to Pittsburgh, by Grand Rapids and Chicago gateways during the period from January 3, 1964 through December 18, 1964 amounted to 169. There were 17 shipments which moved from various points in Illinois, Indiana, Michigan, Ohio, Jamestown and Pittsburgh, to points in North Carolina through Grand Rapids and Chicago, from January 15, 1964 through December 16, 1964, and from January 2, 1964 through December 29, 1964 there were 108 shipments which moved through the Chicago gateway; between points in Maryland on the one hand, and, on the other, points in Indiana and Michigan. This represented substantially all traffic moved by applicant during the stated periods which moved through the gateways and in

some instances applicant interlined this traffic at a gateway point. For example, a shipment moving from Hickory, N. C., to Cadillac, Mich., may have been interchanged with a connecting carrier at Chicago or at Grand Rapids. As an example of mileage savings by use of the short direct routes, applicant presented several actual incidents. The mileage from Grand Rapids to Charleston, W. Va. through the gateway amounts to 770 miles; the direct route is 460 miles, a saving of 310 miles. From Grand Rapids to Richmond, the gateway mileage is 813 as compared to 695 direct. From Chicago to West Virginia points generally the gateway mileage is 837 compared to 461 direct, a savings of 376 miles; and from Chicago to Virginia destinations 880 miles as compared to 754 miles direct, a saving of 126 miles. Based on 1964 traffic experience, elimination of the gateway on traffic moving to Virginia and West Virginia points would effect savings of about $1,200 a year. From Chicago to West Virginia points based on 1964 experience savings would have amounted to approximately $1,143. Another example of mileage savings is a shipment between Lexington, N. C. and Detroit, Mich., which through the gateway involves 973 miles, as compared to 605 miles. Eliminating the gateways on traffic moving to and from North Carolina would be a saving of approximately $1,023 a year, and on traffic moving between Maryland and Michigan points, about $120 per truckload, and between Maryland and Indiana points, about $104 each truckload. Applicant computes its overall operating expense at 71 cents a mile which include the constant expenses which would not vary or be affected by the mileage savings. Using applicant's maintenance transportation and terminal expenses as reflected by its exhibit No. 5 based on 2,640,186 operating miles applicant's cost would be approximately 56 cents per mile and applicant claims that its over-the-road

transportation cost amounts to about 36 cents a mile which perhaps more correctly reflects the actual saving for each mile eliminated. 105 M.C.C. 180–81.

The Hearing Examiner concluded that the plaintiff had met the criteria established by the Interstate Commerce Commission for the granting of applications for elimination of gateways. He therefore recommended that an order be issued by the Commission granting the application.

Four of the seven motor carriers which had opposed the application filed exceptions to the Report and Order recommended by the Hearing Examiner. Operating Rights Review Board No. 3 (hereafter referred to as the Board) of the Interstate Commerce Commission, after considering and adopting the statement of facts submitted by the Hearing Examiner, concluded that the application should be denied. After a request for reconsideration was denied by the Board, plaintiff petitioned the Interstate Commerce Commission for a determination and announcement that the proceedings involved an issue of general transportation importance. This was denied by an order dated June 16, 1966. Having exhausted all administrative remedies, plaintiff thereafter filed this action.

The test which this court must apply when reviewing the action of an administrative agency such as the Interstate Commerce Commission is whether the ultimate findings are based on substantial evidence when the record is viewed as a whole, and whether the agency action is arbitrary or capricious. Universal Camera Corp. v. NLRB, 340 U.S. 474, 95 L.Ed. 456, 71 S.Ct. 456 (1951); 5 U.S.C. § 706. A simple, helpful criterion for judging the substantiality of evidence was set forth in Illinois C. R. Co. v. Norfolk & W. R. Co., 385 U.S. 57, 66, 87 S.Ct. 255, 260, 17 L.Ed.2d 162 (1966):

"Substantial evidence is 'enough to justify, if the trial were to a jury, a refusal to direct a verdict when the

conclusion sought to be drawn from it is one of fact for the jury.' "

With this test in mind, we move to the consideration of whether, viewing the record as a whole, there is substantial evidence to justify the conclusion reached by the Board that present and future public convenience and necessity do not require elimination of the gateways involved. (Warren, Pennsylvania, Chicago, Illinois, and Grand Rapids, Michigan.)

Defendant Commission maintains that the applicant must show (1) that for reasons of safety, economy, or improved efficiency of authorized operations, the application should be granted, or (2) that an actual need exists or will exist for the proposed service which either cannot or will not be met as well by the existing carriers. We accept these criteria.

■ Plaintiff has clearly shown that safety, economy, and efficiency will be served by elimination of the gateways, and there has been no showing by defendant commission or protesting carriers to the contrary. We need only recite the facts to show that granting the application would result in safer, more economical and more efficient service. This alone, however, is not enough to satisfy the requirements of a showing of public convenience and necessity; we must next inquire into the Board's decision with respect to the specific criteria for the elimination of gateways which have been established by the Interstate Commerce Commission and approved by the courts. An applicant must show:

(1) That it is transporting a substantial volume of traffic from and to the points involved by operating in good faith through its gateway and in so operating, is effectively and efficiently competing with the existing carriers, and

(2) That the elimination of the gateway would not enable it to institute a new service or a service so different from that presently provided as to materially improve its

competitive position to the detriment of existing carriers.

(Childress—Elimination Sanford Gateway, 61 M.C.C. 421 (1952), Bowman Transportation, Inc. v. United States, 267 F.Supp. 57, 60 (D.C.1967)).

In order to review the Commission's decision that Blodgett has not satisfied the above criteria, the court must apply the substantial evidence rule to each element of the above test.

(1) Has Blodgett carried a substantial volume of traffic to and from the points involved by operating in good faith through its gateway, and in so operating is Blodgett effectively and efficiently competing with the existing carriers?

The Board made no reference to the substantiality of Blodgett's traffic in parts (3) and (4) of the application, so we may assume that Blodgett has satisfied the requirements of this criterion with regard to parts (3) and (4). The record supports this assumption in that it shows a total of 186 shipments in 1964 through the Chicago and Grand Rapids gateways in part (3), and 108 shipments for the same year through the Chicago gateway in part (4).

With respect to parts (1) and (2) of the application, however, the Board concluded that "[t]he volume of traffic transported from and to the points involved through the Warren County gateway has not been substantial." We find that this conclusion is not supported by substantial evidence and must be reversed.

■ We are aware that substantiality of traffic is a fact question to be decided by the Commission. However, that decision cannot be made in a vacuum. It is a question which must be answered with a view to all of the factors relative to substantiality. In Anchor Van Lines, Inc., Extension—Elimination St. Marys County Gateway, 77 M.C.C. 101, an ap-

plication for a gateway elimination was granted where the applicant had transported only 35 shipments during a fourteen month period. In that case the Commission considered the relatively small size of the company involved and concluded that it was transporting a substantial volume of traffic.

■ The Board made no mention of the size of the applicant in this case. Nor did the Board indicate that it had considered the scope of Blodgett's authority in concluding that it did not handle a substantial volume of traffic. Whereas protestant North American has authority to transport household goods as well as new furniture, and other protestants are mostly general commodity or crated furniture carriers, Blodgett is limited to uncrated, new furniture. This is a very narrow grant of authority and it must be taken into account when determining whether the applicant is transporting a substantial volume of traffic.

A further deficiency of the Board's finding with respect to substantiality of traffic is its failure to indicate how much traffic in uncrated new furniture is handled by protesting carriers between the points involved in parts (1) and (2) of the application.

The Board's findings with regard to volume of traffic are contained in the following excerpt from the Report and Order of the Board, pp. 7–8:

> Applicant is required to meet all of the tests set forth in the preceding paragraph, and we are of the opinion that it has failed to do so with respect to parts (1) and (2) of the application. The volume of traffic transported from and to the points involved through the Warren County gateway has not been substantial. From January 16 to November 24, 1964 under part (1) of the application, applicant transported 15 shipments of new furniture, uncrated, weighing approximately 60,000 pounds; and during 1964 under part (2) of the application,

it transported 44 shipments weighing approximately 164,000 pounds. Applicant has failed to show that it served substantially all of the points that it is authorized to serve particularly in the destination States involved. Of the above 15 shipments transported under part (1) of the application, 3 shipments moved from Holland, Mich., to Alexandria, Va., and the remaining 12 from Grand Rapids, Mich., as follows: a single shipment to Huntington, W. Va., and 11 shipments to five points in Virginia. No shipments moved from Holland to any points in West Virginia or from the remaining origins of Lowell and Otsego, Mich., to any points in Virginia or West Virginia. Applicant served only two points in West Virginia and very limited points in Virginia. Of the 44 shipments transported under part (2) of the application, 11 shipments actually originated at Chicago: a single shipment moved to Wheeling, W. Va., and 10 shipments moved to 7 Virginia points. Aside from a single shipment each moving from Rochester, Minn., and Sheboygan, Wis., to Richmond, Va., the remaining 31 shipments originated at St. Charles, Ill., of which 6 shipments moved to four points in West Virginia and 25 shipments moved to nine points in Virginia. The number of points served in Virginia and West Virginia are limited considering that applicant presently holds statewide authority in those States. 105 M.C.C. 176.

Where questions of competition are involved, it is patently inconclusive to consider only one side of the competitive forces. The simple reason why the other side has not been considered in this case is that, with the exception of North American, no carrier indicated how much, if any, traffic in uncrated furniture it handled between the points involved in parts (1) and (2). Whereas North American in 1964 made only one shipment which would compete in part (1), Blodgett made fifteen. In part (2),

where Blodgett made forty-four shipments in 1964, the record indicates that North American made only nine shipments, all from Chicago.

Even if we assume that some shipments have been made by protestants which compete with Blodgett between these points, the conclusion is inescapable that Blodgett has transported a substantial volume of traffic, when that volume is considered in light of the relatively small size of Blodgett and the very narrow scope of its authority.

In Maryland Transportation Co., Extension—Specified Commodities, 83 M.C.C. 451, the Commission interpreted the criterion under discussion to require a showing that the proposing carrier is an effective competitor as to substantially all commodities and substantially all points within its pertinent outstanding authority. 83 M.C.C. at 455. We do not dispute this interpretation; however, it must be applied in the same manner as the criterion as a whole, i. e., with due regard to the relative size of the applicant and its scope of authority. Anchor Van Lines, Inc., supra. When the scope of operating authority is as narrow as uncrated new furniture, the meaning of such terms as "substantially all points" must be construed accordingly. There is no indication that the Board took this factor into consideration.

■ From the findings of the Hearing Examiner, and from our own examination of the record, we have concluded that Blodgett has transported a substantial volume of traffic from and to the points involved, that it has operated in good faith through its required gateways and in doing so is effectively and efficiently competing with the existing carriers. The finding of Operating Rights Review Board Number 3 is hereby reversed as to the first criterion.

(2) Would the elimination of the gateways enable Blodgett to institute a new service or a service so different from that presently provided as to materially improve its competitive position to the detriment of existing carriers?

Any time a carrier is granted the authority to eliminate a gateway, the result will be a somewhat different service. Certainly this service will be to the advantage of the carrier and its customers; otherwise there would be no reason for making the application in the first place. The test set out above does not forbid the elimination of gateways any time a different and better service may thereby be offered, for if such were the case, no gateway would ever be eliminated.

The test relied on by the ICC provides that a gateway may not be eliminated if the result will adversely affect the competitive position of the existing carriers. The purpose of this test is to protect existing carriers who are engaged in the same service to the same points as the applicant. Curtis Keal Transport Co., Inc.—Extension—New Philadelphia, 73 M.C.C. 249. This is in accordance with the National Transportation Policy to insure stability and "sound economic conditions in transportation and among the several carriers." 49 U.S.C. preceding §§ 1, 301, 901 and 1001 (1958). This does not amount to a complete elimination of competition, however, for this would be at variance with other provisions of that policy which forbid " * * unjust discriminations, undue preferences and advantages * * *" Id.

The Commission, in acting upon applications for authority to operate and extensions of existing authority, must balance the need for safe, efficient, and economical operations against the requirement for sound and effective competition within a given market. It is necessary, therefore, that when acting upon applications, the Commission must make findings as to the effect the proposed grant will have upon competition in the relevant market.

In this case the Hearing Examiner found that granting the gateway elimination request would not adversely affect the competitive position of the existing

carriers. After setting forth the aforementioned criteria which must be applied to gateway elimination applications, the Hearing Examiner stated in his recommended Report and Order:

> Applicant has met these criteria. Certainly for a good many years it has been a substantial competitor for traffic in uncrated furniture in the area here involved, and the elimination of the gateways will not react materially to enhance its present competitive status. Applicant's service is patterned on accumulating less-than-truckload traffic and moving this traffic over weekends providing normally a 60 to 62 hour delivery service to and from these destinations. It will not change this pattern of service. Assuming the accuracy of protestant's computations, which show approximately 60 percent circuitous operation through the gateways, applicant will be able to effect considerable savings. Also the reducing of miles operated will create less exposure to accident and damage hazards. All of these things certainly redound to the benefit of the public and as here where it is shown that the supporting shippers intend no diversion of traffic from the existing motor carriers will continue to use applicant regardless of the outcome of this application, these existing and protesting motor carriers should not be affected substantially should the application be granted.

Although the Board accepted the facts upon which the Hearing Examiner reached the above conclusion, it came to an opposite conclusion. However, at no point in the Board's report did it set forth any facts which would justify its decision. Nor did the Board at any point set forth findings as to the effect that the elimination would have on competitors. It found that significant advantages would accrue to the applicant, but it failed to set forth how or whether these advantages were of such a nature as to "materially improve its competitive position to the detriment of existing carriers."

During oral argument, the Commission conceded that no findings as to any adverse affect on the competitive status of the existing carriers had been set forth in the Board's Decision and Report. The Commission asked that this court infer such a finding from the other conclusions set forth in the Board's order. The findings from which we are to infer that granting this application would have an adverse affect on the other carriers relate solely to the advantages that will accrue to Blodgett. We find that such evidence is insufficient to support an inference that the Board found these advantages would improve the competitive position of Blodgett to the detriment of the existing carriers. It is not enough to find that an applicant will reap certain benefits from the granting of its application. Presumably such advantages will always accrue to the successful applicant, for they are the motivating factor behind his action. However, this is not to say that his competitors will be adversely affected. If such were the case, as we said before, a gateway elimination application could *never* be granted.

 The Supreme Court and the Administrative Procedure Act have established the requirement that an agency must make sufficient findings to support its decisions. In rejecting a decision of the Interstate Commerce Commission in Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) the Supreme Court said:

> "There are no findings and no analysis here to justify the choice made, no indication of the basis on which the Commission exercised its expert discretion. We are not prepared to and the Administrative Procedure Act [15]

"15. Section 8(b), 5 USC § 1007(b), provides that all decisions shall 'include a statement of * * * findings and conclusions, as well as the reasons or basis therefor, upon all the material issues of fact, law, or discretion presented on the record.' [This provision is now contained in 5 U.S.C. § 557(c). Pub.L. 89–554, Sept. 6, 1966, 80 Stat. 387.]

will not permit us to accept such adjudicatory practice. See Jacob Siegel Co. v. Federal Trade Comm'n, 327 U.S. 608, 613–614, 66 S.Ct. 758, 761, 90 L.Ed. 888. Expert discretion is the lifeblood of the administrative process, but 'unless we make the requirements for administrative action strict and demanding, *expertise,* the strength of modern government, can become a monster which rules with no practical limits on its discretion.' State of New York v. United States, 342 U.S. 882, 884, 72 S.Ct. 152, 153, 96 L.Ed. 662, 663 (dissenting opinion). 'Congress did not purport to transfer its legislative power to the unbounded discretion of the regulatory body.' Federal Communications Comm'n v. RCA Communications, Inc., 346 U.S. 86, 90, 73 S.Ct. 998, 1002, 97 L.Ed. 1470, 1475. The Commission must exercise its discretion under § 207(a) within the bounds expressed by the standard of 'public convenience and necessity.' Compare id., [346 U.S. at 91] 73 S.Ct. at 1002, 97 L.Ed. 1470. And for the courts to determine whether the agency *has* done so, it must 'disclose the basis of its order' and 'give clear indication that it has exercised the discretion with which Congress has empowered it.' Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 197, 61 S.Ct. 845, 854, 85 L.Ed. 1271. The agency must make findings that support its decision, and those findings must be supported by substantial evidence. Interstate Commerce Comm'n v. J–T Transport Co., 368 U.S. 81, 93, 82 S.Ct. 204, 211, 7 L.Ed.2d 147; United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 488–489, 62 S.Ct. 722, 729, 86 L.Ed. 971; United States v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 511, 55 S.Ct. 462, 79 L.Ed. 1023." 371 U.S. at 167–168, 83 S.Ct. at 245.

■ If the Board intended to make a finding that existing carriers would be adversely affected, not only should it have given some indication to that effect (which it did not) but also it should

have set forth those facts in the record which would have supported such a conclusion. This was made very clear in Amarillo-Borger Express, Inc. v. United States, 138 F.Supp. 411, 417, 419 (N.D. Tex., 1956), where the court said:

"It is precisely because the scope of judicial review is so narrowly limited, that administrative agencies must, in terms beyond the statutory rubric, reveal the basis for their action by which to judge whether it has met the elemental standards of our system and statutory requirements. A threshold decision by reviewing court is whether there is a 'lack of the basic or essential findings required to support the Commission's order!' (citations omitted)

"Moreover, this requirement has now been made explicit by the Administrative Procedure Act, 5 U.S.C.A. Section 1007(b) which requires a statement of findings and conclusions in their ultimate legal form 'as well as the reasons or basis therefor.'

\* \* \* \* \* \*

"Consequently, we are of the clear opinion that \* \* \* the Commission is obliged in all stages to respect the requirements, the letter and the spirit of the Administrative Procedure Act. Since both it and the general law concerning the sufficiency of the Commission action require an adequate statement of the underlying reasons for the action \* \* \*."

Since the Board failed to make the required findings, we are unable to determine if the ultimate result is supported by substantial evidence. Therefore, the case must be remanded to the Commission for further findings and an appropriate order.

The Order of the Interstate Commerce Commission, Operating Rights Review Board Number 3, is hereby enjoined, annulled, and set aside. The case is remanded to the Interstate Commerce Commission for further proceedings consistent with this opinion.

It is so ordered.