472 A.2d 62

UNITED STEELWORKERS OF AMERICA AFL–CIO, LOCAL 2610

v.

BETHLEHEM STEEL CORPORATION.

No. 23, Sept. Term, 1983.

Court of Appeals of Maryland.

March 9, 1984.

---

666

Larry J. Ritchie, Baltimore (Peter G. Angelos, Baltimore, on the brief), for appellant.

Amicus Curiae brief of Commissioner of Labor & Industry, Department of Licensing & Regulation of the State of Maryland filed. Stephen H. Sachs, Atty. Gen., Paul W. Grimm and David Blum, Asst. Attys. Gen., Baltimore, on the brief.

Paul W. Grimm, Asst. Atty. Gen., for amicus curiae.

Wårren M. Davison, Baltimore, (Earle K. Shawe, J. Michael McGuire and Shawe & Rosenthal, Baltimore, on the brief), for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

RODOWSKY, Judge.

This administrative appeal arises under the Maryland Occupational Safety and Health Act (MOSHA), Md.Code (1957, 1979 Repl.Vol.), Art. 89, §§ 28–49B. Under consideration is an order of the Commissioner of Labor and Industry (Commissioner) which determined that the respondent, Bethlehem Steel Corporation (Bethlehem), had violated MOSHA with respect to the hazard of heat stress at the Sparrows Point mill. Because the Commissioner's decision does not inform us (or Bethlehem) of the act or omission which he found to have constituted the violation, we shall remand.

On July 23, 1978 two steelworkers suffered heat stroke while working in separate furnace areas at Sparrows Point. Heat stroke is the most severe form of heat illness. It is usually characterized by a body temperature in excess of 105°F, by an absence of sweating and by central nervous system or brain dysfunction resulting in coma, stupor, confusion or delirium. Heat stress, as defined by one medical witness, is "an abnormal stress placed upon the human body in the form of heat, either heat from the environment or increased production of heat within the body[, which] may lead to heat illness."

One of the stricken workers, Dunlap Johnson (Johnson), died within three days. The other employee, Pleasant Sharpe (Sharpe), after having made excellent progress toward recovery and while still in the hospital, suffered cardiopulmonary arrest with paralysis resulting. He died sometime after the close of the administrative record.

Investigation by the Commissioner's occupational safety and health staff (MOSH) led to Bethlehem's being cited for a serious and willful MOSHA violation.[1] The citation relied on § 32(a)(1) which provides that each employer shall

furnish to each of his employees employment and a place of employment which are safe and healthful as well as free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees
. . . .

This provision is known as the general duty clause. It is to be distinguished from the statutory requirement that an employer comply with applicable standards promulgated under MOSHA. *See* § 32(a)(2); *cf.* § 32(b). No standards for occupational exposures to hot environments have ever been promulgated by the Commissioner. Nor have any such standards been promulgated pursuant to the substantially similar federal act, 29 U.S.C. § 651 *et seq.* (OSHA).[2]

---

1. Under § 40(a) an employer who "willfully or repeatedly" violates MOSHA is subject to a civil penalty not in excess of $10,000 per violation. Penalty for a serious violation may be up to $1,000. § 40(b).

2. The National Institute for Occupational Safety and Health in 1972 recommended to the then United States Secretary of Health, Education and Welfare criteria for a standard relating to heat stress. See U.S. Dep't of H.E.W., Pub. No. (NIOSH)–76–100, *Standards for Occupational Exposures to Hot Environments, Proceedings of Symposium, February 27–28, 1973, Pittsburgh, Pennsylvania* app. B (1976). The Standards Advisory Committee on Heat Stress in January 1974 recommended to the Assistant United States Secretary of Labor for Occupational Safety and Health standards for work in hot environments. *Id.* app. C. These recommendations have not been implemented through adoption of formal standards.

MOSHA § 36(a) in part requires that a citation "shall describe with particularity the nature of the violation . . . ." Additionally, "the citation shall fix a reasonable time for the abatement and correction of the violation." *Id.* The October 11, 1978 citation in this case, after referring to the two July 23 cases of heat stroke and to other cases of heat stress that had occurred at the mill on July 16, 22 and 23, stated

[t]hat the employer, having specific knowledge regarding safety and health hazards in the steel industry, and with specific knowledge of aforesaid hazardous conditions pertaining to excessive heat, made no reasonable efforts by precautions or other means to eliminate this hazardous condition in disregard for its statutory obligation to furnish its employees with a safe and healthful workplace.

Bethlehem was given three days within which to correct the alleged violation.

Following an extensive hearing, the Commissioner's examiner vacated the citation on November 7, 1979. He concluded that MOSH had failed to prove that heat was recognized in the steel industry as a hazard likely to cause serious injury or death and that, in any event, MOSH had not met the burden of showing that the steps taken by Bethlehem "were not reasonable and feasible steps in regard to a heat hazard without the guidance of a heat standard."

Petitioner, United Steelworkers of America, AFL–CIO, Local 2610 (Steelworkers), filed exceptions to the hearing examiner's determination, although Steelworkers had not participated in the hearing.[3] By order of May 21, 1980 the Commissioner reversed the examiner's determination, and, after modifying from "willful" to "serious" the degree of violation cited, imposed a $1,000 penalty on Bethlehem. The Commissioner found the relevant hazard to be heat stress. We shall return to the Commissioner's decision for more specific analysis below.

---

**3.** No issue has been raised before us concerning this procedure, on the validity of which we express no opinion.

Bethlehem's administrative appeal to the Circuit Court for Baltimore County resulted in reversal on December 7, 1981 of the Commissioner's order. The circuit court focused on the citation's charge that Bethlehem had "made no reasonable efforts by precautions or other means to eliminate this hazardous condition" and concluded that the charge was not supported by substantial evidence.

Steelworkers then appealed to the Court of Special Appeals, which affirmed. *United Steelworkers, Local 2610 v. Bethlehem Steel Corp.,* 53 Md.App. 366, 454 A.2d 850 (1983). Because the Commissioner never specified that which Bethlehem had failed to do, but which he believed the general duty clause required Bethlehem to have done, the intermediate appellate court adopted the following approach in its substantial evidence analysis. It set forth what it found to be "[i]mplicit in the Commissioner's determination," and it described various "suggestions" which it gleaned from the testimony of the chief witness for the agency. *Id.* at 375, 454 A.2d at 854–55. The court concluded:

> The evidence shows that [Bethlehem] furnished cool-off rooms, water fountains, salt tablets and issued forceful and regular reminders of the hazards of heat exposure. In light of the evidence that these precautions were well within the limits of those adopted by other companies in the industry, we conclude that the standards proposed under the general duty clause amounted to an afterthought. In the absence of the adoption of any regulation or rule, we find that the exaction of these standards under the circumstances would be arbitrary and unreasonable. [*Id.* at 377–78, 454 A.2d at 856.]

Steelworkers petitioned for certiorari, raising six questions which are readily reducible to two:

(1) Is the scope of the general duty clause limited to industry custom and practice; and

(2) Was there substantial evidence to support the Commissioner's determination?

(1)

■ Steelworkers read the opinion of the Court of Special Appeals in this case as having adopted a rule of law under which the type of protective measure which the Commissioner can order in implementing the general duty clause is limited to a precaution recognized by custom and practice in the industry. We do not necessarily concur in Steelworkers' interpretation of the opinion. Bethlehem does not even argue that such an interpretation is or should be Maryland law. However, some basis for Steelworkers' reading may be inferred from that court's favorable citation to, and quotation of, *S & H Riggers & Erectors, Inc. v. OSHRC,* 659 F.2d 1273 (5th Cir.1981) and *B & B Insulation, Inc. v. OSHRC,* 583 F.2d 1364 (5th Cir.1978). The rule in the Fifth Circuit is that

> at least in the absence of a clear articulation by the [agency] of the circumstances in which industry practice is not controlling, due process requires a showing that the employer either failed to provide personal protective equipment customarily required in its industry or had actual knowledge that personal protective equipment was required under the circumstances of the case. [*S & H Riggers, supra,* 659 F.2d at 1275 (footnote omitted).]

We do not believe that industry custom and practice is a *per se* limitation under MOSHA's general duty clause on the types of precautions required of an employer.

In order to meet the kind of due process concerns that underlie the Fifth Circuit position, the standard of a reasonable person who is familiar with the practices of the subject industry is utilized by an apparent majority of the federal appellate circuits in reviewing agency action taken under certain OSHA standards which are phrased in general terms, as is the general duty clause. These courts ask whether the precaution specified by OSHA is one which such a reasonable person would take. *See L.R. Willson & Sons, Inc. v. OSHRC,* 698 F.2d 507, 513 (D.C.Cir.1983); *Tri-State Roofing & Sheet Metal, Inc. v. OSHRC,* 685 F.2d 878, 880 (4th Cir.1982) (per curiam); *Pratt & Whitney Aircraft v. Secre-*

*tary of Labor,* 649 F.2d 96, 106 (2d Cir.1981); *Voegele Co. v. OSHRC,* 625 F.2d 1075, 1077–79 (3d Cir.1980); *Bristol Steel & Iron Works v. OSHRC,* 601 F.2d 717, 722–23 (4th Cir. 1979); *National Industrial Contractors, Inc. v. OSHRC,* 583 F.2d 1048, 1054 (8th Cir.1978); *American Airlines, Inc. v. Secretary of Labor,* 578 F.2d 38, 41 (2d Cir.1978); *Allis-Chalmers Corp. v. OSHRC,* 542 F.2d 27, 30 (7th Cir.1976); *Brennan v. Smoke-Craft, Inc.,* 530 F.2d 843, 845 (9th Cir.1976); *Cape & Vineyard Div. v. OSHRC,* 512 F.2d 1148, 1152 (1st Cir.1975). And, as to the general duty clause of OSHA, *see Donovan v. Royal Logging Co.,* 645 F.2d 822, 831 (9th Cir.1981) ("[A] reasonably prudent employer in the industry would have known that the proposed method of abatement was required under the job conditions where the citation was issued."); *General Dynamics Corp. v. OSHRC,* 599 F.2d 453, 464 (1st Cir.1979). But the test of a reasonable person familiar with the practices of the industry cannot be limited to the custom and practice itself. "[T]he inquiry must be broad enough to prevent an industry, which fails to take sufficient precautionary measures against hazardous conditions, from subverting the underlying purposes of [OSHA]." *Bristol Steel & Iron Works, supra,* 601 F.2d at 723. And *see Voegele Co., supra,* 625 F.2d at 1078; *Cape & Vineyard Div., supra,* 512 F.2d at 1152.

As the instant case comes to us, Bethlehem does not dispute the finding that heat stress is a recognized hazard in the furnace areas of the Sparrows Point mill. The real issue is whether there are additional, feasible precautions, which the general duty clause obligates Bethlehem to take. In this respect *L.R. Willson & Sons, Inc., supra,* 698 F.2d at 514, furnishes a good statement of the interrelationship between agency proof of a violation and industry custom and practice.

This ... record simply does not provide sufficient evidentiary support for the Commission's conclusion that the Secretary had met his burden of proving a violation of section 1926.28(a) by Willson. We are particularly troubled by the total lack of evidence as to the normal practice

with respect to the use of safety belts in the structural steel erection industry. Although we do not hold that such industry evidence would in all cases establish what was "reasonable" in the specific circumstances or that such evidence must be introduced in every case in order to find a violation of section 1926.28(a), we suggest that evidence of industry use or non-use of safety devices is highly probative of the feasibility and safety of such devices. In the absence of such evidence, the Secretary must provide alternative, probative evidence of the feasibility and safety of protective devices in order to meet his burden of proof that a reasonably prudent employer would have so provided for the protection of his employees. [Footnote omitted.]

### (2)

In this case, however, we are unable to decide whether the burden of proof has been met because of the way in which the Commissioner rendered his final decision. The heart of the Commissioner's opinion reads:

I further find that the Employer failed to render its workplace free of hazards. The Employer contended that protective measures had been instituted that would prevent the likelihood of harm to its employees. Another Employer contention was that a program had been initiated to eliminate the hazard of exposure to heat stress. I do not agree that the Employer's program has reduced the likelihood of death or serious physical harm as indicated by the death of one employee and serious physical harm to another. I find that the program of the Employer relative to heat stress failed to provide adequate precautionary measures to protect the employees from the hazard of heat stress. I further find deficiency in the application of the program as developed. The testimony of the Employer's witnesses discloses no studies of heat stress areas since 1974–1975 by the Employer; no heat measurements since 1975; and, that, although a booklet prepared by Bethlehem Steel Corporation covering heat stress and a program

to control the same was published by it in 1972, the Employer made no effective use of its contents.

This is a reference to Bethlehem's *Supervisory Safety Manual Ch. 5, Control of Environmental Hazards,* which in part recommends taking certain measurements "to determine the effective temperature which, in turn, can be related to permissible exposure times for different work rates." From these determinations, "the best control methods are developed." Of the heat control methods recommended in the manual, the record reflects that most, if not all, were implemented in some way in the subject furnace areas at Sparrows Point.

The Commissioner's decision then finds:

There was ample evidence offered by MOSH concerning achievable measures that were readily available to the Employer which would have and should have been utilized by a reasonably prudent employer to eliminate or substantially reduce the hazard of heat stress.

I find the Employer to have been in violation of its general duty obligation to assure its employees a safe and healthful workplace as far as possible as a result of the failure to take demonstrably feasible measures which could have materially reduced the likelihood of hazardous conditions, and thereby protecting its employees from hazards.

When the Commissioner's findings of ultimate facts are compared to the record, it is apparent that he did not resolve conflicts of underlying fact. Further, in this case MOSH, with varying degrees of specificity, advanced multiple theories of violation, but we have no way of telling from the Commissioner's opinion which, if any, of these theories he adopted. Indeed, we do not even know whether our reading of the record has distilled a MOSH theory in the same way as the Commissioner might understand it. Nor do we know whether other theories lie in the record which the Commissioner *sub silentio* may have adopted, but which we, unaided by the presumed technical expertise of the Commissioner,

have not discerned.[4] In order to illustrate the state of the record, some review of the evidence must be presented. This review is not intended to intimate any opinion on our part whether or not substantial evidence to support a violation of the general duty clause exists with respect to any of the aspects of the record mentioned.

From the standpoint of educating employees about the hazards of exposure to heat, there was evidence by Bethlehem that each new worker receives a booklet concerning general safety precautions; that periodically flyers are mailed to each worker's home warning against heat exposure and describing preventive and first aid measures; that posters are hung throughout the plant at the onset of warm weather warning against becoming overheated and giving first aid advice; and that each foreman meets individually with each worker in his crew to review heat safety measures. On the other hand, O'Neil Banks (Banks), the agency's executive assistant commissioner for technical services, testified that MOSH was told by certain workers during its investigation that employees had not been instructed how to deal with heat and that the posters had not been erected until after the two heat stroke cases occurred. Banks also criticized the posters as lacking in information on prevention and as giving insufficient and contraindicated advice.

Bethlehem showed that there were many conveniently located water fountains and salt tablet dispensers throughout the furnace areas. Banks referred to disagreement in the medical profession about the use of salt tablets. He also said they were useless for heat stroke.

Because Johnson had arthritis and a history of hypertension, and Sharpe was an alcoholic, predisposition to heat illness from these conditions was explored at the hearing.

---

4. The hearing in this case consumed 13 days. There are 2,644 pages of testimony, 33 exhibits introduced by MOSH and 66 exhibits introduced by Bethlehem. The testimony of MOSH's principal technical witness occupied three days of hearings and 654 pages of transcript.

Further, each of the two heat stroke victims had, at some time prior to July 23, 1978, been away from the furnace area environment on vacation or sick leave. Bethlehem's proof was that employees returning to work after extended absence due to illness are required to produce a certificate from the employee's attending physician certifying that the employee is able to perform his job. Banks took the position that if an employee had a medical condition, known to Bethlehem's medical department, the employee should not be assigned to a job where his condition places him at a significantly greater risk from heat. Banks also emphasized that persons working in hot environments must become "acclimatized." This is a reference to physiological changes which enable an individual to tolerate heat stress. A medical witness indicated acclimatization requires 10 to 20 days. Bethlehem pointed out that an employee who was returning after an extended absence to a job in the furnace areas could not be transferred by management to a different job in a cooler environment. Under both the collective bargaining agreement and a court order, transfer to an entry level position in a different department must be requested by the employee seeking transfer and is awarded on the basis of plantwide seniority and ability.

Bethlehem emphasized that it provides air conditioned rooms, called cool-off rooms, throughout the furnace areas. Banks, testifying on the basis of measurements made by a member of his staff in two of the cool-off rooms, opined that the temperature in the rooms was not low enough to reduce the body heat of an overheated person. Bethlehem contended that one set of measurements had been taken in a cool-off room where air conditioning was intentionally shut off because the room also served as the control booth for a furnace which was then shut down. The other set of measurements had been taken in a functioning cool-off room but after its door had been propped open for some unknown length of time, presumably by Bethlehem employees. Banks testified that employees should not be allowed to adjust the

thermometer setting of cool-off rooms or to let the cool air escape by propping the door open.

Bethlehem demonstrated that in the furnace areas workers are engaged in physical activity for only limited periods when a "heat" is processed, *i.e.,* when a batch of molten metal is tapped or poured from the furnace. An individual in a job like Sharpe's would ordinarily be engaged in physical exertion for 35 to 50 minutes and then would be at rest for more than one and one-half hours. One in Johnson's job classification works approximately 40 minutes at a time, followed by rest, so that in an eight-hour shift there would be four to five hours of noncontinuous work. Banks was of the view that Bethlehem's employees should be required, under penalty of discipline, to utilize the cool-off rooms during all or some part of these rest periods; otherwise, under certain conditions, workers might not be able to rid their bodies of the build-up of heat. Several of Bethlehem's witnesses, who had worked for many years in the furnace areas, testified that a worker can tell if he is suffering from heat stress and whether he is in need of rest and cooling off. MOSH points to evidence that Johnson, before going into heat stroke, involuntarily dropped to one knee. He attributed this to his arthritis. Although he had worked in a hot environment for many years, he may not have perceived the build-up of heat in his body.

Bethlehem's evidence is that it is traditional in steelmaking for the worker to be free to take a break and to cool off whenever he feels overheated, even if this occurs during a portion of the shift when there is work to be done. Banks, however, emphasized monitoring for the purpose of applying one or more heat indices proposed by industrial hygienists. He advocated periodically measuring or estimating factors like ambient, reflective and metobolic heat, relative humidity and air speed. These factors are then used in a formula to compute a numerical value which, in relation to a heat index, indicates whether the need had arisen for an individual worker to use a cool-off room and, possibly, for how long. Bethlehem asserts that the general duty clause may not be

the vehicle for such a program and that it can only be established under a detailed standard or regulation.

Briefs filed in this Court also reflect the amorphous nature of the Commissioner's decision. The petitioning Steelworkers contend there was substantial evidence "that there were demonstrable, feasible measures which would have materially reduced the likelihood of the hazard of heat stroke." The Union selects at least six types of measures mentioned at the hearing, each of which it contends can be found to have been supported by substantial evidence. But Steelworkers do not, and cannot, state which, if any, of these measures selected from the testimony were found by the Commissioner to be required under the general duty clause. Analysis in an *amicus* brief by MOSH is similar. MOSH also notes that the Court of Special Appeals "listed a number of specific safety measures [which] it found in a review of the record . . . ." This approach to judicial review for substantial evidence is inconsistent with fundamental principles of administrative law.

Under MOSHA § 37(e), "[t]he Commissioner shall, after a review of the proceedings . . . issue an order, based on findings of fact . . . ." The Maryland Administrative Procedure Act, Md.Code (1957, 1982 Repl.Vol.), Art. 41, § 254 in part provides:

A final decision shall include findings of fact and conclusions of law, separately stated. Findings of fact, if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings.

In *State Commission on Human Relations v. Malakoff*, 273 Md. 214, 229, 329 A.2d 8, 17 (1974), Judge Digges, writing for the Court, said that

it is appropriate to point out, as we have in previous opinions, not only the importance but the necessity that administrative agencies resolve all significant conflicts in the evidence and then chronicle, in the record, full, complete and detailed findings of fact and conclusions of law.

Indeed, this is mandated by Code (1957, 1971 Repl.Vol.) Art. 41, § 254.

For the Commissioner to state that "[t]here was ample evidence offered by MOSH concerning achievable measures that were readily available to [Bethlehem]" tells us nothing in relation to this record and precludes judicial review. "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." *United States v. Chicago, M., St. P. & P.R. Co.*, 294 U.S. 499, 511, 55 S.Ct. 462, 467, 79 L.Ed. 1023, 1032 (1935).

■ Judicial review of administrative action differs from appellate review of a trial court judgment. In the latter context the appellate court will search the record for evidence to support the judgment and will sustain the judgment for a reason plainly appearing on the record whether or not the reason was expressly .relied upon by the trial court. However, in judicial review of agency action the court may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167–68, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207, 215–16 (1962); *Securities and Exchange Comm'n v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626, 636–37 (1943); *Harborlite Corp. v. I.C.C.*, 613 F.2d 1088, 1092–93 (D.C.Cir.1979); *International Paper Co. v. Federal Power Comm'n*, 476 F.2d 121, 128 (5th Cir.1973); *USV Pharmaceutical Corp. v. Secretary of Health, Education & Welfare*, 466 F.2d 455, 461–62 (D.C.Cir.1972); *Marco Sales Co. v. F.T.C.*, 453 F.2d 1, 7 (2d Cir.1971); *Davis v. Weinberger*, 390 F.Supp. 813, 816 (M.D.Pa.1975); *Blodgett Uncrated Furniture Service, Inc. v. United States*, 288 F.Supp. 591, 598–99 (W.D.Mich.1968); *Bell Lines, Inc. v. United States*, 263 F.Supp. 40, 44–46 (S.D.W.Va.1967); 3 Davis, *Administrative Law Treatise* § 14:29 (2d ed. 1980). "The courts may not accept appellate counsel's *post hoc* rationalizations for agency action . . . ." *Burlington Truck Lines, Inc., supra*, 371 U.S. at 168, 83 S.Ct. at 246, 9 L.Ed.2d at 216.

Were we to search the subject record for evidence sufficient to support any one or more of the theories advanced by Steelworkers or by MOSH, and then to decide if that theory constitutes a violation of the general duty clause, we would be performing the administrative function that MOSHA commits to the Commissioner, and not our proper function of judicial review.

 Additionally, the Commissioner's findings are especially inadequate for judicial review because the alleged violation concerns the general duty clause. Where the employer's asserted obligation does not rest on the specific terms of a standard expressly designed to govern employer obligations, but is based solely on the general duty clause, the administrator "must be constrained to specify the particular steps a cited employer should have taken to avoid citation, and to demonstrate the feasibility and likely utility of those measures." *National Realty and Construction Co. v. OSHRC*, 489 F.2d 1257, 1268 (D.C.Cir.1973). *Accord Donovan v. Royal Logging Co., supra*, 645 F.2d at 829; *St. Joe Minerals Corp. v. OSHRC*, 647 F.2d 840, 844 (8th Cir.1981); *Champlin Petroleum Co. v. OSHRC*, 593 F.2d 637, 640 (5th Cir.1979); *Titanium Metals Corp. v. Usery*, 579 F.2d 536, 543 (9th Cir.1978); *General Electric Co. v. OSHRC*, 540 F.2d 67, 69–70 (2d Cir.1976). There are no specific findings in this case which advise Bethlehem how to avoid future citations for the same claimed violation.

In *J.I. Hass Co. v. Dep't of Licensing and Regulation*, 275 Md. 321, 332, 340 A.2d 255, 261 (1975) we emphasized, quoting from *National Realty, supra*, the necessity that the record indicate that demonstrably feasible measures would have materially reduced the hazard. In this case the different precautionary measures argued by Steelworkers appear to present varying degrees of difficulty in proving feasibility. However, absent the Commissioner's having first specified the violation which he draws from this long and, in part, technical record, we are unable to rule as a matter of law

that there lie therein no facts which would support a violation of any type. Therefore, we remand.

JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AND TO REMAND THIS CASE TO THE CIRCUIT COURT FOR BALTIMORE COUNTY WITH INSTRUCTIONS TO VACATE THE ORDER OF THE COMMISSIONER OF LABOR AND INDUSTRY AND TO REMAND TO THE COMMISSIONER OF LABOR AND INDUSTRY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO ABIDE THE RESULT.