58 A.3d 482

**DAKRISH, LLC t/a Vineyards Elite**

v.

**Ran RAICH et al.**

**No. 1327, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

Nov. 30, 2012.

Reconsideration Denied Jan. 30, 2013.

Linda C. Carter, Riverdale Park, MD (Douglas C. Meister, Meyers, Rodbell & Rosenbaum PA, Riverdale Park, MD, Edward J. Gilliss, James L. Shea, Jr., Royston, Mueller McLean & Reid, LLP, Towson, MD), all of the brief, for Appellant.

Andrew H. Baida (Caroline L. Hecker, Rosenberg, Martin, Greenberg, LLP, on the brief), Baltimore, MD, for Appellee.

Panel: MATRICCIANI, GRAEFF and JAMES R. EYLER, (Retired, Specially Assigned), JJ.

GRAEFF, J.

On August 2, 2010, Ran Raich, on behalf of Maza, LLC t/a The Wine Loft, appellee, submitted an application to the Board of Liquor License Commissioners for Baltimore County (the "Board"), for the issuance of a "Class A" beer, wine, and liquor license. On October 18, 2010, the Board held a hearing on the application. Dakrish, LLC t/a Vineyards Elite ("Vineyards Elite"), appellant, appeared at the hearing through one of its licensees in opposition to Mr. Raich's petition. At the conclusion of the hearing, the Board denied the application.

On November 16, 2010, Mr. Raich petitioned for judicial review in the Circuit Court for Baltimore County. Following a hearing, the circuit court reversed the Board's decision, finding that "the Board's decision was flawed because it failed to balance appropriate factors to be considered by the Board pursuant to Maryland Code (2011 Repl.Vol.) Art. 2B, § 10–202(a)(2)(i), and gave undue weight to the potential for impact on existing licensees." The court remanded the case to the Board with instructions to issue a liquor license to Mr. Raich.

On appeal to this Court, Vineyards Elite presents the following questions:

1. Was the Board's decision to deny the Application supported by substantial evidence?

2. Did the Board commit an error of law by considering evidence of the potential impact of the Application on other licensees' businesses in the area?

For the reasons set forth below, we shall reverse the judgment of the circuit court and remand to that court with instructions to affirm the Board's decision denying Mr. Raich's application.

## STATUTORY AUTHORITY

For purposes of context, before setting forth the testimony and evidence adduced at the hearing before the Board, we quote the relevant statutory provision relating to the issuance of a license.

### § 10–202. Board of License Commissioners.

(a) *General procedure.—*

\* \* \*

(2)(i) Before approving an application and issuing a license, the board shall consider:

1. The public need and desire for the license;

2. The number and location of existing licensees and the potential effect on existing licensees of the license applied for;

3. The potential commonality or uniqueness of the services and products to be offered by the applicant's business;

4. The impact on the general health, safety, and welfare of the community, including issues relating to crime, traffic conditions, parking, or convenience; and

5. Any other necessary factors as determined by the board.

(ii) The application shall be disapproved and the license for which application is made shall be refused if the Board of License Commissioners for ... any county determines that:

1. The granting of the license is not necessary for the accommodation of the public;

2. The applicant is not a fit person to receive the license for which application is made;

3. The applicant has made a material false statement in his application;

4. The applicant has practiced fraud in connection with the application;

5. The operation of the business, if the license is granted, will unduly disturb the peace of the residents of the neighborhood in which the place of business is to be located; or

6. There are other reasons, in the discretion of the board, why the license should not be issued.

(iii) Except as otherwise provided in this section, if no such findings are made by the board, then the application shall be approved and the license issuing authority shall issue the license for which application is made upon payment of the fee required to the local collecting agent.

## FACTUAL AND PROCEDURAL BACKGROUND

Mr. Raich's liquor license application indicated that the location sought to be licensed was 1809 Reisterstown Road # 111, Baltimore, Maryland 21208 ("Reisterstown Road"). Mr. Raich testified that, in February 2010, he had been approved, with respect to a different license application, "as to his fitness and character," but the license ultimately was denied. The Board acknowledged that Mr. Raich had been qualified before, that there was not "any question" that Mr. Raich was a "fit and proper person," and that the "only real issue here is whether the public need and accommodation aspects of the requirements for a new license will be met." The Board noted that, "by population count, a license is available, so the only question is the public need."

Mr. Raich had worked as the manager at DiWine & Spirits ("DiWine") for three and a half years. He had reviewed stores in the area and decided to draft a business plan to open an organic and local wine store. He stated that none of the organic and local regional wine products that he would sell

would be in competition with any other wine or liquor store in the area. According to Mr. Raich, Vineyards Elite's store carries approximately 750 wines, with approximately fifteen local wines. Mr. Raich opined that none of the product that he wanted to carry would affect Vineyards Elite's business.

During the time that Mr. Raich worked at DiWine, sales had been "pretty steady." Business was good and sales had gone up in the last year, which was one of the reasons he decided to open another shop. Mr. Raich testified that DiWine focuses on high-end wine and "generates a lot of business outside the Pikesville area."

Mr. Raich's concept for his store, to carry organic and local wines, fit with the concept of Trader Joe's, a nearby store that carries "a lot of organic product, inexpensive, and that's the target for the people that come in." Trader Joe's "organic model" was the same model that he would use for his store.

The size of his proposed store would be approximately 2,400 feet, and the hours of operation would be 10:00 a.m. to 9:00 p.m. The store would have approximately six employees. There had been a previous liquor license at the same location, inside a grocery store.

Mr. Raich testified that his concept had garnered a lot of support. He stated: "People love the idea for organic and local regional wine. They [are] really supporting me." He had collected more than 1,300 signatures from people who shop in the location of the proposed store, and most of the people were happy that another store was going to come to the area, and "they liked the idea of local wine and organic." At the hearing, approximately 60–70 people were in attendance to support Mr. Raich's proposal. The Board observed that "there are more people here as proponents than opponents."

On cross-examination, Mr. Raich testified that the license for which he had applied, and was denied, in February of 2010, was for a location approximately three miles from the Reisterstown Road location. He agreed that, after that license was denied, he applied for a transfer of the DiWine license to

the Reisterstown Road location. He then applied again for a new license in June of 2010 for the Reisterstown Road location, prior to the application at issue here. Thus, the application for the Reisterstown Road location before the Board was the fourth license for which Mr. Raich had applied.

Upon questioning by the Board, Mr. Raich agreed that, if his application for the Reisterstown Road location was granted, there would be two "Class A" license-holders "within a baseball throw" of each other. He stated, however, that his proposal was for a "[c]ompletely different concept" than that of DiWine.

The Board asked Mr. Raich whether he had a business plan "showing the opportunity of being at this location in this economic environment." Mr. Raich responded that he had talked to two experts who thought there was "a huge gap for demand in this area for wine, and definitely for organic wine." After Mr. Raich stated that he anticipated doing approximately two million dollars in business at the Reisterstown Road location, the Board asked whether he had suggested to the owner of DiWine that they establish a line of organic wines. Mr. Raich responded that DiWine was "doing very well on what they are doing," and DiWine was not "going to change the concept of the store."

Dr. Gerald Patnode testified on Mr. Raich's behalf as an expert in estimating the need and public accommodation offered by a new Class A license at the Reisterstown Road location. He testified that the proposed Reisterstown Road location "is a very, very strong market," stating that, "looking at the expenditures for beer, wine and liquor in this market area, within a one-mile radius . . . there's excess demand over supply." Dr. Patnode opined that there was a "market gap of 1.685 million dollars," and that the residents in the area were being served by only two immediate licenses. There had been another license in the area, Sutton Place Gourmet, "for years . . . and the people in that area were used to having that license available, and now it's been gone for awhile," with Trader Joe's occupying that space. In Dr. Patnode's opinion,

the "market [is] underserved due to lack of licenses in the area." He believed that there is "a need and accommodation in this district."

Dr. Patnode acknowledged that, in February 2010, with regard to Mr. Raich's previous application, he had testified before the Board that there was no need for another license "three miles north" of the proposed Reisterstown Road location. He stated, however, that, at that time, his concern was that "the market had not had an opportunity to absorb the impact of" new licenses in the area, and therefore, he "could not justify that there was, in fact, a public need and accommodation." He agreed that the population in the area had not changed since February 2010, but he stated that his change of position regarding a new license was not based on population, but rather, on "expenditures and absorption." He reiterated that the area was "showing an abundance of market demand," maintaining that, if "anybody was concerned about economic impact, it would be DiWine, and he's not."

The Board expressed some concern regarding Dr. Patnode's position in February 2010, and his position at this hearing, stating: "So you're suggesting that, in the fullness of time, which in this case is to say six, seven months, you now feel diametrically opposed to the opinions you expressed back in February of 2010"? Dr. Patnode responded: "If we were talking about the same location, I'm not sure I would be diametrically opposed. This is a significant change of location in terms of where you're putting this." The Board responded that, nevertheless, the Reisterstown Road location is "less than three miles south," from the location implicated in the previous application, "[w]hich the Board saw fit to rule against." Dr. Patnode agreed that was correct.

According to Dr. Patnode's findings, there is "at least eight million dollars worth of unfulfilled demand" in the area, and Mr. Raich's estimation of "market potential for himself of approximately two million dollars is not unrealistic." He opined that, if Mr. Raich "captures that marketplace, he'll

have a niche market that is built around the profile of those people that come to Trader Joe's."

Brian Greene, a representative of the Festival at Woodholme Center, testified that the shopping center "is sort of revamping the merchandising" to "bring a little bit of energy and excitement into the center." He believed Mr. Raich's concept was "a good fit, he's offering something different and current, which kind of fits with the direction that we're heading in the center."

Krishna Patel, manager of Vineyards Elite, testified that Vineyards Elite is approximately one mile away from Mr. Raich's proposed Reisterstown Road location. When Vineyards Elite submitted an application for a liquor license, DiWine and DiWine's owner, Arian Jakob, opposed the application. Mr. Jakob's e-mail correspondence opposing that application was made part of the record. Ms. Patel testified that Vineyards Elite protested the addition of another liquor license because "we are struggling at this point, after two and a half years," and if another new store opened in the immediate area, Vineyards Elite's business might suffer. She stated that Vineyards Elite has thirty racks of wine, and although she has "good wine knowledge" and loves organic and local wines, "from all the local wines, only the sweet wines sell." Ms. Patel testified that all of the area liquor stores include local and organic wines in their inventory, but "we don't do that much business." If Vineyards Elite could make "two million dollars from ... organic wines," it would do so. Ms. Patel testified that Mr. Raich's "numbers ... are not realistic."

On cross-examination, Ms. Patel agreed that Vineyards Elite is only about one hundred yards away from Dugan's, and Dugan's did not go out of business after Vineyards Elite opened. When asked how Mr. Raich's proposed specialization in organic and local wines would impact Vineyards Elite's bottom line, Ms. Patel responded: "Can ... he ... guarantee hundred percent that volume of his business is eighty percent organic and local? Can he write it down? If he's so confident, what is his back-up plan? Suppose it doesn't work?

What is his back-up plan?  Can anybody stop him once he gets his license?"  Vineyards Elite had modified its business based on customer requests, and if more customers asked for organic wine, Vineyards Elite would carry more organic wine. The Board asked Ms. Patel whether the opening of Valley Village had affected Vineyards Elite's sales, to which she responded: "[W]hen the new license came up, our growth has not been that much."

Ken Bernstein testified in his capacity as representative of David S. Brown Enterprises, the managing agent for two nearby shopping centers, Valley Village and Woodholme Square.  Mr. Bernstein opposed the issuance of a new license, stating that DiWine "does a very good job and is an asset to our center," and if a new license was granted, his tenant, DiWine, may end up closing its business.  The Board then asked Mr. Bernstein whether he was "aware of the fact that Mr. Jakob wrote a letter in favor of the granting of this license," to which Mr. Bernstein responded that he was.  He stated:

> My discussions with Mr. Ja[k]ob ... when that liquor license was to be transferred across the street, we discussed as to why he was doing that, and he told me that his sales were down significantly, they were doing roughly twenty percent less business than they had done before, and that he didn't believe—honestly, Mr. Ja[k]ob is an absentee owner and he's not there, and Mr. Raich runs the store.
>
> And he felt as though he—the transfer of the license and doing it in the way he did it, he thought it was okay to do.

Dr. Anirban Basu was called as an expert witness and submitted a written report analyzing the need and desirability of a new liquor license based on the criteria the Board was required to consider under the statute.  Dr. Basu opined that "there is no economic rationale for another liquor license to be granted at 1809 Reisterstown Road."  Dr. Basu's testimony regarding his report was, in relevant part, as follows:

[T]here does not seem to be any deficiency in consumption of alcohol, whether a one-mile radius, three-mile radius, or five-mile radius.

In other words, the public already seems to be fully accommodated in terms of their alcohol purchases.

[I]f you look at total household expenditures ... 1.2 percent of household expenditures is for alcohol.

\* \* \*

[S]o we found no public need for the license.

There's some evidence that there might be some desire, and there's signatures both ways, but we did not find any evidence of need.

With respect to the second criterion, there are already a lot of stores along Reisterstown Road.

\* \* \*

One of the criteria where it's a little bit more complicated, the third criterion is the potential commonality or uniqueness of the services and products offered by the applicant's business.

\* \* \*

... I won't get much into it, but, of course, it's a debatable point.

Criterion four .... [y]ou've probably seen the literature ... that indicates even small increases in the presence of alcohol can have deleterious impact on the quality of the life in the community.... And, finally ... there is opportunity cost here. In other words, if you put another liquor store in the area, again, there are plenty along Reisterstown Road, and there's one just a throw's distance away that means that space will not be available for something else.

\* \* \*

It should be noted ... that the population around the Festival ... is ... older, and there are a sea of services and

products that could be made available to that class of people.

                    *       *       *

[T]he data say ... younger households consume more alcohol than older ones.

Dr. Basu opined regarding "how the addition of another package goods store would impact those in the immediate vicinity of the proposed applicant":

All things being equal, I don't buy a shortage of supply. And ... that market share has to come from somewhere.

And if you have a finite sense of dollars, it has to come from somewhere. It's true, it could come from other items in the economy....

But at the close of the day .... it is more likely than not, to the success of this store gaining market share, they would gain market share at the expense of other stores.

On cross-examination, Dr. Basu agreed that some of his demographic data was approximately eighteen years old. The Board noted that Dr. Basu's report indicated that "the license is not necessary for the accommodation of the public," and that

[a]dditional reasons for the license denial include[:] No. 2. There is no evidence of deficient spending upon alcohol among the households living immediately proximate to the proposed additional license. Three. Any additional product differentiation can be accomplished at existing locations. Four. There are social risks associated with reaching a social tipping point in alcohol availability.

Dr. Basu agreed that he did not have any conclusive data to prove that "if this stor[e] opens, any other store will close."

In addition to the foregoing testimony, the Board had before it exhibits, documents, letters, and e-mails constituting the "record of proceedings."

At the conclusion of the hearing, the Board issued its opinion on the record. It stated, in pertinent part, as follows:

This is a very troubling case. There are a number of issues here that make one figuratively scratch one's head, and then ultimately play a part leading to the conclusion that the Board is going to come to.

One of the concerns the Board has ... is this substantial statement by Mr. Ja[k]ob.

I don't think I have ever seen as overwhelming an endorsement for someone who's endorsing his employee to move literally across the street.

\* \* \*

[T]hat brings up the concern that if this man, Mr. Ja[k]ob, who certainly is a very good businessman, after all, his place is doing well financially, if he would submit such a letter, and yet not be here to answer what I think he would have had to assume would be questions the Board would have, or inquiries from counsel, it's a troubling situation.

It's not dispositive. We can't take anymore from him than what's in the record....

\* \* \*

This is a situation in which the Board ... has to take and inculcate and understand and masticate all the facts in coming to a conclusion that we are charged with the responsibility to make.

The Board then discussed the testimony of Dr. Patnode, "who was here nine months ago ... arguing against the issuance of another license, and today, having changed his mind." In assessing his testimony, the Board stated that it could not "discern any real substantive and compelling reasons why he changed his mind, other than the obvious one, which is to say that he becomes an advocate in this case for the proponents."

With respect to the testimony of Dr. Basu, the Board stated that he "is obviously a man of great renown within the business community and one who's constantly being quoted on his opinions sought by various sundry governmental, quasi-

governmental, and non-governmental agencies." It discussed Dr. Basu's testimony as follows:

He tells us, the first thing he tells us, is that the chart he gives us, I must say, is undercut by the virtue of the fact it's almost twenty years old, which reasons he utilizes in the report. However, he then goes to his Exhibit 1.

I would refer to page one of his exhibit where he talks about select consumer expenditure surrounding 1809 Reisterstown Road, in which he concludes . . . from page five . . . The area surrounding the proposed liquor store is decidedly older than most areas. Fully, thirty-eight percent of residents within a one-mile radius are over the age of fifty-five. This compares to 26.8 percent and 24.2 percent in Baltimore County and Maryland, respectively.

He goes on to amplify . . . with respect to men over forty and then over sixty, 11.80, 8.0 percent heavier drinking; and women, even more minuscule, 2.5, 1.9, in that same area of fifty-nine to sixty-plus.

He then says . . . under number two, There is no evidence of deficient spending upon alcohol among the households living immediately proximate to the proposed additional location, and any additional product differentiation can be accomplished at existing locations.

And what he's saying, I think, is that—and this was gleaned from the totality of the testimony—the market growth in this area is not significant.

Actually, my notes reflect in that context, Dr. Patnode, upon cross examination, agreed with that proposition.

There appears to be a plentiful supply of locations.

The Board then discussed the testimony of Ms. Patel and the impact of an additional license in the area:

I think there, what she says, to put it simply, is compelling, which is to say, Where is this two million dollars that shows up on the charts and what have you that Mr. Raich indicates he expects to gross at this location?

When you take all of those aspects into consideration, you're left with the following, and it's ironic in a way,

because you certainly agree with counsel that seldom, if ever, do you see an applicant so qualified.

You appear not to have an enemy in the world. People have signed your application, come in to speak for you, have inundated the Board with statements indicating as to the strength of your character and your quality as a business-man.

But in coming into this context, the Board must consider that this adds a license. This is not three licenses as a transfer, but, rather, a fourth.

And with that, I think, the inevitable diminution—that is the conclusion of this Board—of the overall dilution of product dollars in this demographics, in that Pikesville area.

After relating the various testimony, the Board found that it was "not appropriate to grant this license." It stated:

That having been said … I think … if you can find a location—not in this immediate area—clearly, I think there is no question that you're qualified to have a license.

It's just by taking the totality of the testimony that we have here, this Board cannot, and accordingly, will not grant the license.

## DISCUSSION

### I.

### Standing to Seek Judicial Review

As a preliminary matter, Mr. Raich argues that this appeal should be dismissed because Vineyards Elite is not an aggrieved party with standing to seek judicial review of the Board's decision. This is so, he argues, because "the only harm it claimed it might suffer as a result of the issuance of a license to [Mr. Raich] was a possible competitive injury," and "such a competitive injury does not make it an 'aggrieved' party."

In support of this argument, Mr. Raich directs us to Art. 2B, § 16–101, which is entitled, **"Appeals to courts."** Specifi-

cally, Mr. Raich relies on the following portion of the statute in support of the argument that Vineyards Elite must be an "aggrieved" party to appeal:

(a) *In general.*—The decision of a local licensing board, in approving, suspending, revoking and restricting, or refusing to approve, suspend, revoke or restrict a license, or a licensee, shall be subject to appeal in the manner provided in this section.

(b) *Who may appeal.*—(1) Subject to paragraph[ ] ... (3) of this subsection, the following persons may appeal a decision of a local licensing board *to the circuit court* of the county upon payment of all costs incident to the hearing before the local licensing board:

(i) Any alcoholic beverages licensee that holds a license issued by the local licensing board;

(ii) An applicant for an alcoholic beverages license that is the subject of the decision by the local licensing board; and

(iii) Any group of not less than 10 persons who are residents or real estate owners in the precinct or voting district in which the licensed place of business is located or proposed to be located.

\*        \*        \*

(3) A licensee, license applicant, or group that appeals a decision of a local licensing board **under paragraph (1) of this subsection, must be aggrieved** by the decision of the board and must have appeared at the hearing of the board either in person, by a representative, or by the submission of a written document that was introduced at the hearing.

(Emphasis added).

Vineyards Elite argues that § 16–101(f), not § 16–101(b), is the relevant statutory provision. Section 16–101(f) provides, in pertinent part:

(f) *Appeals to Court of Special Appeals or Court of Appeals.*—(1) Notwithstanding any other provision of law, any party of record to an appeal of a decision of a local

licensing board to the circuit court may appeal the decision of the circuit court:

(i) To the Court of Special Appeals[.]

Vineyards Elite argues that, pursuant to the plain language of § 16–101(f), standing is expressly conferred on Vineyards Elite. We agree.

It is well-settled in Maryland that, in interpreting statutory provisions, "[o]ur goal is to 'ascertain and effectuate the intent of the Legislature.'" *Md. Ins. Comm'r v. Cent. Acceptance Corp.,* 424 Md. 1, 36, 33 A.3d 949 (2011)(quoting *Mayor and Town Council of Oakland v. Mayor and Town Council of Mountain Lake Park,* 392 Md. 301, 316, 896 A.2d 1036 (2006)). In doing so, "we look first to the language of the statute, giving it its natural and ordinary meaning." *State Dept. of Assessments and Taxation v. Maryland–Nat'l Capital Park & Planning Comm'n,* 348 Md. 2, 13, 702 A.2d 690 (1997). "If the language is clear and unambiguous on its face, our inquiry ends." *Forster v. Office of Pub. Defender,* 426 Md. 565, 580, 45 A.3d 180 (2012). *Accord Montgomery County v. FOP,* 427 Md. 561, 572, 50 A.3d 579 (2012)(" 'If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written.'") (quoting *Dep't of Human Res. v. Hayward,* 426 Md. 638, 650, 45 A.3d 224 (2012)).

On the other hand, if the language of the statute is ambiguous, the " 'courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of [the] enactment [under consideration].'" *Stoddard v. State,* 395 Md. 653, 662, 911 A.2d 1245 (2006) (quoting *FOP v. Mehrling,* 343 Md. 155, 174, 680 A.2d 1052 (1996)). An ambiguity exists when there are "two or more reasonable alternative interpretations of the statute." *Chow v. State,* 393 Md. 431, 444, 903 A.2d 388 (2006)(quotation omitted). In that event, an appellate court will resolve the ambiguity by looking to the statute's legislative history, case law, and statutory purpose, avoiding a con-

struction of the statute that is " 'unreasonable, illogical, or inconsistent with common sense.' " *Stoddard,* 395 Md. at 662–63, 911 A.2d 1245 (quoting *Blake v. State,* 395 Md. 213, 224, 909 A.2d 1020 (2006)).

Here, § 16–101(b)(3) clearly provides that a person appealing *to the circuit court* from the board's decision must be aggrieved.[1] After Mr. Raich's application to the Board for a liquor license was denied, he petitioned the circuit court for judicial review as an "applicant for an alcoholic beverages license," pursuant to § 16–101(b)(ii). Clearly, Mr. Raich was "aggrieved" by the Board's decision denying his license under § 16–101(b)(3), and no issue of standing was raised in the circuit court.

Section 16–101(f), however, is the pertinent statutory provision addressing appeals to this Court. Pursuant to the predecessor to § 16–101(f),[2] appeals from a liquor board's decision were "severely limited." *Bd. of Liquor License Comm'rs for Baltimore City v. Hollywood Prod., Inc.,* 344 Md. 2, 7, 684 A.2d 837 (1996). In 1992, however, the legislature amended the law to provide that "any party of record to an appeal of a decision of a local licensing board to the circuit court may appeal the decision" to this Court. *Id.* The language of § 16–101(f) does not include, as does § 16–101(b), a requirement that the person appealing be "aggrieved." Rather, the current version of the statute "broadly confers the right of appeal to any 'party of record.' " *Id. Accord Bd. of License Comm'rs for Prince George's County v. Global Express Money Orders, Inc.,* 168 Md.App. 339, 342 n. 1, 896 A.2d 432 (2006).

---

1. Article 2B, § 16–101 does not define the term "aggrieved." The Court of Appeals has explained, however, that to be "aggrieved" for purposes of judicial review of administrative decisions, "a person ordinarily must have an interest 'such that he is personally and specifically affected in a way different from ... the public generally.' " *Sugarloaf Citizens' Ass'n v. Dep't of Env't,* 344 Md. 271, 288, 686 A.2d 605 (1996)(quoting *Med. Waste Assoc. v. Md. Waste Coalition, Inc.,* 327 Md. 596, 611, 612 A.2d 241 (1992)).

2. Maryland Code (1990 Repl.Vol.) Art. 2B, § 175(f).

At oral argument, counsel for Mr. Raich argued that, notwithstanding that the word aggrieved does not appear in the language of § 16–101(f), the purpose of the 1992 amendment to the statute was to "make the appeals process in local liquor board cases consistent with other administrative appeals," citing *Baltimore County Licensed Beverage Ass'n Inc. v. Kwon,* 135 Md.App. 178, 186 n. 4, 761 A.2d 1027 (2000). Counsel asserted that, because there is a requirement in administrative appeals generally that a party be aggrieved, it follows that a party seeking to appeal to this Court in a case involving a liquor board decision similarly must be aggrieved.

It is true that, in an appeal pursuant to the Administrative Procedure Act ("APA"), a party must be aggrieved. Section 10–223(b), which governs appeals to this Court under the APA, provides:

(b) Right of appeal—

(1) A party **who is aggrieved** by a final judgment of a circuit court under this subtitle may appeal to the Court of Special Appeals in the manner that law provides for appeal of civil cases.

Md.Code (2009 Repl.Vol.) § 10–223 of the State Government Article ("SG") (emphasis added).[3]

█ The liquor board, however, is not an agency subject to the requirements of the APA. *Valentine v. Bd. of License Comm'rs of Anne Arundel County,* 291 Md. 523, 435 A.2d 459 (1981) (judicial review provisions do not apply to liquor boards). *See also Pridgeon v. Bd. of License Comm'rs of Prince George's County,* 406 Md. 229, 958 A.2d 289 (2008)(The APA "is not applicable to proceedings before the liquor boards."). In the case of an appeal to this Court in a liquor license case, § 16–101(f) does not include a requirement that a

---

3. Indeed, the case that Mr. Raich cites for the proposition that a person seeking judicial review of an administrative proceeding " 'must both be a "party" to the administrative proceedings and be "aggrieved," ' " *Sugarloaf Citizens' Association,* 344 Md. at 287, 686 A.2d 605 (quoting *Medical Waste Assoc.,* 327 Md. at 611, 612 A.2d 241), was an appeal discussing the requirement for judicial review under the Administrative Procedure Act.

party be aggrieved. Rather, it provides that "any party of record to an appeal of a decision of a local licensing board to the circuit court may appeal the decision of the circuit court" to this Court.

In construing a statute, we will neither "add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words the Legislature used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 181, 776 A.2d 645 (2001). The General Assembly did not include the word aggrieved in § 16–101(f); we cannot add that requirement. If the General Assembly had so intended, it would have included that language, as it did in SG § 10–223 and Art. 2B, § 16–101(b). *See Forster*, 426 Md. at 599, 45 A.3d 180 ("[W]here Congress includes particular language in one section of a statute but omits it in another ... it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting *Gardner v. State*, 420 Md. 1, 11, 20 A.3d 801 (2011)).

Moreover, nothing in the legislative history for § 16–101(f) indicates an intent by the General Assembly that a party appealing to this Court be aggrieved. The floor report for House Bill 26 explained the state of the law prior to the enactment of § 16–101(f):

The decision of the circuit court is final and effective at once and no further appeal shall lie. An appeal may be taken to the Court of Special Appeals only if the circuit court decides a point of law at variance with any decision previously rendered by any other judge of the State on the same question.

The report then explained the purpose of the change in the law:

[S]ince circuit court opinions are not reported, it is virtually impossible to find a contrary circuit court opinion to provide a basis for appeal [to this Court] under current law. Testimony ... indicated that this requirement is unique and that the bill [to enact § 16–101(f) ] would make the appeals

process in local liquor board cases consistent with other administrative appeals.

■ This legislative history indicates that the purpose of enacting § 16–101(f) was to allow for appeals from liquor board decisions beyond the circuit court, where none were allowed before, in the same way appeals are allowed in other administrative cases. We did not find anywhere in the bill file, or in the language of any of the drafts of the proposed statute, any reference to a requirement that a party to an appeal be aggrieved.[4] Rather, the right to appeal was given to "any party of record to an appeal of a decision of a local licensing board to the circuit court."

■ Mr. Raich does not dispute that Vineyards Elite was a party of record to the circuit court appeal. Indeed, in Mr. Raich's certificate of service, he certified that he sent Vineyards Elite a copy of his Petition for Judicial Review. Vineyards Elite appeared before the Board as a Protestant and filed a Response to Petition for Judicial Review in the circuit court. Vineyards Elite participated in the proceedings before the circuit court and is identified as a party in the circuit court docket entries. Following entry of the circuit court's order, Vineyards Elite filed a motion to reconsider, and Mr. Raich filed an opposition thereto. Accordingly, pursuant to § 16–101(f), as a party of record to the circuit court proceeding, Vineyards Elite has standing to appeal to this Court. Dismissal of the appeal is not warranted.[5]

---

**4.** Of course, even absent a requirement that a party be aggrieved, a party may appeal only from an adverse judgment. *Wright v. Baker*, 197 Md. 315, 318, 79 A.2d 159 (1951) (appellant cannot object to a judgment in his favor).

**5.** Vineyards Elite also argues that, even if there is a requirement that it be aggrieved, it meets that requirement because "its business will be deleteriously affected different [from] the public at large." Although our holding in this case does not require us to address this issue, we are inclined to agree. As indicated, to be aggrieved for purposes of judicial review, one must have an interest " 'such that he is personally and specifically affected in a way different from ... the public generally.' " *Sugarloaf*, 344 Md. at 288, 686 A.2d 605 (quoting *Med. Waste*, 327 Md.

## II.

### Substantial Basis for the Board's Decision

Vineyards Elite argues that there was substantial evidence in the record to support the Board's decision to deny Mr. Raich's application, and the Board did not commit an error of law by considering evidence of the potential for impact on existing licensees. It asks us to reverse the judgment of the circuit court requiring assignment of a liquor license to Mr. Raich.

Mr. Raich argues that the circuit court properly reversed the Board's decision denying his request for a liquor license, asserting that, pursuant to the mandatory language in § 10–202(a)(2)(i), the Board was required to consider all of the enumerated factors. Mr. Raich argues, however, that the Board considered only § 10–202(a)(2)(i)(2), the "number and location of existing licensees and the potential effect on existing licensees of the license applied for," and it "den[ied] the License on the sole ground that a new license would result in an 'inevitable diminution' and 'overall dilution of product dollars' in the area where Mr. Raich indicated his business would be located." [6]

Section 16–101(e)(i), sets forth the statutory standard to be applied in judicial review actions from liquor board decisions, as follows:

---

at 611, 612 A.2d 241). Here, if an additional liquor license was granted in the immediate geographical area, Vineyards Elite, a nearby licensee, risked a direct effect to its business, increased competition, and a possible decrease in its sales. *See Jordan Towing, Inc. v. Hebbville Auto Repair, Inc.*, 369 Md. 439, 442, 800 A.2d 768 (2002) (issuance of an additional towing license in the same vicinity where the protestants alone held licenses was sufficient standing to challenge the additional license as aggrieved parties because the protestants' businesses were directly affected and suffered special damages different in kind from that suffered by the general public).

**6.** Mr. Raich concedes that the Board properly considered the potential effect on existing licensees as one of the statutory criteria, but he argues that the circuit court properly found that the Board erred in considering this as "the sole factor."

Upon the hearing of such appeal, the action of the local licensing board shall be presumed by the court to be proper and to best serve the public interest. The burden of proof shall be upon the petitioner to show that the decision complained of was against the public interest and that the local licensing board's discretion in rendering its decision was not honestly and fairly exercised, or that such decision was arbitrary, or procured by fraud, or unsupported by any substantial evidence, or was unreasonable, or that such decision was beyond the powers of the local licensing board, and was illegal.

Judicial review of a decision by a liquor board "is similar to review of decisions by most other administrative agencies." *Blackburn v. Bd. of Liquor License Comm'rs for Baltimore City*, 130 Md.App. 614, 623, 747 A.2d 725 (2000). In *Global Express*, we explained the standard:

In reviewing the decision of an administrative agency, this Court performs the same function as the circuit court. *Dep't of Labor, Licensing & Regulation v. Muddiman*, 120 Md.App. 725, 733 [708 A.2d 47] (1998)(citing *Dep't of Human Res. v. Thompson*, 103 Md.App. 175, 188 [652 A.2d 1183] (1995)). We review the decision of the agency, not that of the circuit court. *Wisniewski v. Dep't of Labor, Licensing & Regulation*, 117 Md.App. 506, 515–16 [700 A.2d 860 (1997)] (citing *Westinghouse Elec. Corp. v. Callahan*, 105 Md.App. 25, 32 [658 A.2d 1112] (1995)). When an agency, including a local alcoholic beverage licensing board, acts in a fact-finding or quasi-judicial capacity, we review its decision to determine whether it was rendered in an illegal, arbitrary, capricious, oppressive, or fraudulent manner. *Christopher v. Montgomery County Dep't of Health and Human Servs.*, 381 Md. 188, 213–14 [849 A.2d 46] (2004); *Giant Food, Inc. v. Dep't of Labor, Licensing & Regulation*, 356 Md. 180, 185 [738 A.2d 856] (1999) (citing *Dep't of Natural Res. v. Linchester Sand & Gravel Corp.*, 274 Md. 211, 224 [334 A.2d 514] (1975)); *Bd. of License Comm'rs v. Toye*, 354 Md. 116, 121 [729 A.2d 407] (1999). Our role is limited to determining if there is "substantial evidence in

the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *Muddiman,* 120 Md.App. at 733 [708 A.2d 47] (quoting *United Parcel Serv., Inc. v. People's Counsel,* 336 Md. 569, 577, [650 A.2d 226] (1994)); *see also [Kwon, supra,* 135 Md.App. at 186–87, 761 A.2d 1027]. The Court of Appeals has defined "substantial evidence" as "such evidence as a reasonable mind might accept as adequate to support a conclusion" and "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Mastandrea v. North,* 361 Md. 107, 133 [760 A.2d 677] (2000)(quoting *Mayor of Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 398 [396 A.2d 1080] (1979)); *see also Blackburn v. Bd. of Liquor License Comm'rs,* 130 Md.App. 614, 634 [747 A.2d 725] (2000) (citations omitted). Under the substantial evidence test, we may not substitute our own judgment for that of the board. *Blackburn,* 130 Md.App. at 623–24 [747 A.2d 725] (citing *Baines v. Bd. of Liquor License Comm'rs,* 100 Md.App. 136, 142 [640 A.2d 232] (1994)). When reviewing factual issues, we must review the agency's decision in the light most favorable to the agency since its decision is prima facie correct and carries with it the presumption of validity. *Toye,* 354 Md. at 125 [729 A.2d 407] (citing *Catonsville Nursing Home, Inc. v. Loveman,* 349 Md. 560, 569 [709 A.2d 749] (1998)). Moreover, the action of the local licensing board is presumed to be proper and to serve in the best interest of the public. Md.Code § 16–101(e)(1)(i); *Toye,* 354 Md. at 121 [729 A.2d 407]. The burden of proof is on the licensee to show that the board's decision was arbitrary, fraudulent, unsupported by substantial evidence, or illegal. Md.Code § 16–101(e)(1)(i); *Toye,* 354 Md. at 121 [729 A.2d 407].

*Global Express,* 168 Md.App. at 344–46, 896 A.2d 432.

Mr. Raich argues that the Board did not make sufficient findings on the requisite factors, other than § 10–202(a)(2)(i)(2), the "number and location of existing licensees." He asserts, citing *United Steelworkers of America v. Bethle-*

*hem Steel Corporation,* 298 Md. 665, 472 A.2d 62 (1984), that "it is beyond this Court's purview to determine whether . . . there is 'substantial evidence under each of the remaining factors that provide substantial support for the Board's decision to reject the Application.' " Mr. Raich contends that it "is not this Court's role to comb through the record for supporting evidence concerning the other factors in § 10–202(a)(2)(i) which the Board did not consider when it denied Mr. Raich's license application by attaching dispositive weight to 'the potential effect on existing licensees of the license applied for.' "

At issue in *Bethlehem Steel,* 298 Md. at 667, 472 A.2d 62, was an order of the Commissioner of Labor & Industry, which determined that Bethlehem Steel had violated the Maryland Occupational Safety & Health Act. The Court of Appeals observed that the record in that case was "long and, in part, technical," *id.* at 680, 472 A.2d 62, and it concluded that the Commissioner's findings of fact "did not resolve conflicts of underlying fact," nor did its opinion specify which of the "multiple theories of violation," if any, the Commissioner had adopted. *Id.* at 674, 472 A.2d 62. Thus, the Court held that the Commissioner's final decision, which did not "inform us (or Bethlehem) of the act or omission which he found to have constituted the violation," *id.* at 667, 472 A.2d 62, was "inadequate for judicial review." *Id.* at 680, 472 A.2d 62. In reaching that conclusion, the Court observed that the Commissioner was required to issue an order, based upon findings of fact, pursuant to the APA, which provided: "A final decision shall include findings of fact and conclusions of law, separately stated. Findings of fact, if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings." *Id.* at 678, 472 A.2d 62.

The Court noted that, in "judicial review of an agency action the court may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency" in its order. *Id.* at 679, 472 A.2d 62. In that regard, the Court observed:

Judicial review of an administrative action differs from appellate review of a trial court judgment. In the latter context the appellate court will search the record for evidence to support the judgment and will sustain the judgment for a reason plainly appearing on the record whether or not the reason was expressly relied upon by the trial court.

*Id.*

Mr. Raich contends that, similar to the Commissioner in *Bethlehem Steel,* the Board here did not make adequate findings on the record with respect to each of the applicable factors to support its denial of his license application. He asserts that the "only reason given by the Board" in its decision was "[s]afeguarding the market share of existing licensees," and because the Board did not make more explicit findings as to the other applicable factors in its decision, we cannot uphold it under *Bethlehem Steel.* We disagree.

■ As indicated, the liquor board, unlike the Commissioner of Labor & Industry, is not an agency subject to the requirements of the APA. Indeed, in the liquor licensing statute, "[t]here is no express requirement that the Board set forth specific findings of fact and conclusions of law," *Blackburn,* 130 Md.App. at 624, 747 A.2d 725, as agencies subject to the APA are required to do. Nor has either party cited any other provision of law that requires the Board to address seriatim the factors that it must consider under the statute.

This Court has recognized, however, that "[i]n order for any meaningful review to be conducted ... the Board must [address the various factors], at least informally." *Id.* In *Blackburn,* we concluded that, because "neither the transcript of the hearing before the Board nor the Board's letter to the licensees' counsel" set forth the basis for its decision or suggested a finding as to any particular violation, the circuit court erred in affirming the Board. *Id.* That, however, is not the case here.

As stated previously, our role is limited to determining whether there is substantial evidence in the record as a whole

to support the Board's conclusion. We conclude that there is, based on the testimony in the transcript, the exhibits, and the Board's comments on the record.

As set forth in detail, *supra*, during the hearing, the Board had before it evidence regarding (1) the public need and desire for the license, including Dr. Basu's report and testimony, as well as Dr. Patnode's testimony; (2) the number and location of existing licensees and the potential effect on existing licensees, including the testimony of both Dr. Basu and Dr. Patnode, as well as Ms. Patel; (3) the potential commonality or uniqueness of the services and products to be offered by Mr. Raich's proposed business, including Mr. Raich's own testimony; (4) the impact on the general health, safety, and welfare of the community, including issues relating to crime, traffic conditions, parking, or convenience, including Dr. Basu's literature on the quality of life in the community; and (5) other factors, including that this was Mr. Raich's fourth attempt to obtain a liquor license in the area. The Board specifically stated that it had to consider "all the facts" in making its decision, and that, in "taking the totality of the testimony," the Board would deny the application for a license. Thus, the record does not support a finding that the Board considered only one factor.

The record as a whole in this case is sufficient to allow for meaningful review. We hold that there was substantial evidence in the record to support the Board's decision.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE DECISION OF THE BOARD OF LIQUOR LICENSE COMMISSIONERS FOR BALTIMORE COUNTY. COSTS TO BE PAID BY APPELLEE.**

WOODWARD, J. did not participate in the decision in this case.