**REPORTED**

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0763

September Term, 2012

WOODBURN'S BEVERAGE, INC.

v.

BOARD OF LICENSE COMMISSIONERS
FOR CALVERT COUNTY, ET AL.

Woodward,
Zarnoch,
Bair, Gary E.
 (Specially Assigned),

JJ.

Opinion by Zarnoch, J.

Filed: March 26, 2014

More than thirty-five years ago, a lawyer for Giant Food, Inc. told a Senate

Committee:

> It is the desire of many Maryland residents to be able to purchase beer and wine at our supermarkets. This view is expressed continually by our customers, who ask . . . why we don't sell beer and wine in our stores. Few understand the legal complications and limitations that have been imposed on us.[1]

The General Assembly paid little heed to this plea, as it enacted tougher prohibitions

on the transfer of alcoholic beverage licenses to "chain stores," "supermarkets" and "discount

houses." Chapter 991, *Laws of 1978*.[2] The reach of those restrictions is the central issue in

---

[1]Comments of Arthur Koch prepared for Senate Economic Affairs Committee on Senate Bill 970, dated March 16, 1978.

[2]For the ease of the reader, we will refer to this statute as the "chain store/supermarket law." It is codified at Md. Code (1957, 2011 Repl. Vol.), Article 2B, § 9-102(a-1), which provides:

> A Class A, B, or D beer license, beer and wine license, or beer, wine and liquor license, except by way of renewal, may not be granted, transferred, or issued to, or for use in conjunction with, or upon the premises of any business establishment of the type commonly known as chain stores, supermarkets, or discount houses. This subsection does not apply to or affect any business establishment already holding such a license or the possibility of such licensee having the license transferred to a similar type of business establishment. Discount houses do not include licensees who sell at discount prices.

This law was originally enacted in 1962 and at that time, applied only to Class A, B or D beer, wine and liquor licenses. Chapter 99, *Laws of 1962.* The 1978 legislation applied the prohibition specifically to beer licenses, beer and wine licenses, and beer, wine and liquor licenses of the enumerated classes. There are also local provisions in Article 2B restricting the licensing of chain stores and supermarkets. *See, e.g.,* Article 2B, § 9-213(f)(1).

this appeal of a decision of the Circuit Court for Calvert County upholding the denial by appellee, Board of License Commissioners for Calvert County ("the Board"), of an application to transfer the location of a licensed establishment from that of appellant, Woodburn's Beverage, Inc. ("Woodburn's"), to the Food Lion, LLC in Lusby.[3]

## FACTS AND PROCEEDINGS

### 1. Woodburn's Licensing History

Woodburn's name, ownership, location and licensing classification have not remained static over the years. As far as this controversy is concerned, Woodburn's Food Market began life in 1945 as the successor to the Lusby Variety Store, a 20 x 30 foot premises, which had a Class B (on sale) beer license that was transferred to Woodburn's. Although the time line is a little unclear over the next few decades, Woodburn's was granted a change from its Class B license to a Class A (off sale)[4] beer license, which was used at Woodburn's Food Market in Solomons Island.[5]

In 1988, the licensee applied to transfer the Class A license to a new location in

---

[3]Another party to this appeal is appellee Patuxent Wine & Spirits, Inc. ("Patuxent"), which opposed the transfer of the license before the Board.

[4]Generally, under Article 2B, a B license is used by hotels or restaurants for sales of beer on the premises or elsewhere, while a Class A license is for sales of beverages for consumption off the premises only.

[5]It is not clear whether Woodburn's ever operated in Lusby and if it did, when it moved to Solomons Island. The Board has included in an appendix to its brief, a 1973 application of Woodburn's for a Class A beer license. The application describes the premises in Solomons Island as 60 x 100 feet. We take judicial notice of this public record that provides necessary background and reject Woodburn's motion to strike the document.

Solomons Island, one containing 9,225 square feet in Patuxent Plaza on Route 2 and this transfer was approved by the Board.

From 1945 to 1992, Woodburn's Food Market was operated by Benjamin F. Woodburn or his family. However, in 1992 the business was sold to Thomas F. McKay, Elizabeth Johnson and Susan Jones and the license was transferred to Woodburn's Beverage, Inc., an entity created by the three new owners. The name of Woodburn's Food Market was retained.

In June of 2010, Woodburn's applied for a Class B beer and wine license (on sale).[6] The application indicated that the food market had grown to 16,000 square feet. The Board granted the license change, however, with a restriction that did not permit the sale of wine "off sale."

Finally, on June 1, 2011, Woodburn's applied for a Class A beer and wine license. The premises described in the application was that of the Food Lion in Lusby. Thus, Woodburn's sought a transfer of the proposed license to the Food Lion premises. The proposed transfer was the subject of a hearing before the Board on June 23, 2011.

---

[6]In an appendix to the Board's brief is a 1995 application by Woodburn's for a Class A beer and wine license. There is no indication what happened to this application, but obviously it was never granted. This application plays no role in our analysis.

3

## 2.      Proceeding Before the Board

The principal issue before the Board was whether the transfer to the Food Lion premises ran afoul of the chain store/supermarket law. Woodburn's counsel noted that it only sought to transfer the location of the licensee and that there was no change in ownership in Woodburn's Beverage, Inc. "[A]ll we're doing is moving from one supermarket to another supermarket."

At the time of the hearing, Woodburn's Food Market had been forced to close. Woodburn's attorney observed that the closing was caused by "increased competition."[7]

McKay testified that when he acquired the food market in 1992, it was a "supermarket":

> Yes, it was a supermarket. Many would describe it as a neighborhood supermarket. The Food Marketing Institute of the United States classifies food stores in, basically, three categories. A grocery store is either a supermarket, which are larger than grocery stores, that range from about 10,000 square feet all the way up to almost an unlimited number, and then the second, another classification, or smaller grocery stores, really are called produce markets. And if you're not a produce market, then you are considered a small grocery store where you sell snacks, and beverages and sandwiches, you are considered a convenience store. So, as defined by the Food Market Institute and certainly the standards of the industry at the time, Woodburn's was a supermarket. As a matter of fact, at the time, most supermarkets were ranging in the size of 15,000 square feet in this country. Woodburn's was just over 10,000 square

---

[7]McKay testified that although Woodburn's Food Market had ceased regular hours in April and had lost its lease, it remained open on weekends to liquidate its inventory, including alcoholic beverages. At the present time, the premises are closed.

4

feet so it was certainly, at that time, considered a supermarket, and still is today.

He went on to note that both Woodburn's and Food Lion were supermarkets:

> We sell basically the same product and that is a breakdown of what Woodburn's percentage of those products are and that's a breakdown of what Food Lion's percentage of those products are. And you can see they are generally the same. Food Lion sells more groceries than we do, dry groceries, but they probably sell more dry groceries than any supermarket because they give a lot of credit on prices for groceries, dry groceries, but not so much credit for price on the other items. And you can see that their percentage of sale for deli and bakery and produce is either better or as good as Food Lion because a lot of customers buy staple groceries at Food Lion and would come to us for produce or meat or deli and bakery products. But both the Food Lion store and the Woodburn's stores are comparable in size, overall size. Woodburn's is approximately twenty thousand square feet and Food Lion is thirty nine thousand square feet.

McKay testified that Woodburn's was leasing space in the Food Lion. His counsel described the arrangement between Food Lion and Woodburn's as to checkouts.

> . . . Food Lion is going to be handling the transactions, running it through their computer system. They are going to be actually handling the day to day sales, under the oversight of Woodburn's. So you'll be checking out through the Food Lion register and it will be tracked through the computer what is alcohol and what is not alcohol.

Woodburn's counsel argued that there was no legal prohibition to the transfer because the chain store/supermarket law "does not apply to or affect . . . any business established already holding such a license. That's where we are."

The transfer request was opposed by some witnesses. One, the daughter of the

5

original owners of Woodburn's Food Market; a representative of the Calvert County Chamber of Commerce; and Patuxent Wine and Spirits.

Patuxent's representative said:

> [L]et's say it was the same license for the entire period, the question is not just is it grandfathered, but is it being transferred to a similar establishment. I've listened to everything I've heard tonight and I don't think it could be more dissimilar. You are taking a local license, owned by a local licensee for a long period of time in an independent store and, in effect, you are handing it to the management of a nationwide, at least regional, chain store. 1300 stores according to their website. I don't think it could be more dissimilar. The operation of the Food Lion is, I mean it's a shell, you're moving the shell entity of Woodburn's into the Food Lion. You've got Food Lion running it, Food Lion stocking the shelves, Food Lion checking it out.

The Board did not rule on the transfer until August 25, 2011, after some Board membership had changed. At that hearing, Board member Swoap stated:

> I move that this Board find that according to Section 9-102 of Article 2B there is a general prohibition against having liquor licenses associated with so called supermarkets, discount houses and chain stores. Specifically, Section 9-102(a1) prevents a Class A, B, or D license from being transferred or issued to, or for use in conjunction with, or upon the premises of chain stores, discount houses or supermarkets. Further, Section 9-102(a1) provides for an exemption from this general prohibition for any such license already in existence at the time of enactment of this statute in 1962. I move that the Board find that the Lusby Food Lion is in fact a supermarket and/or chain store as defined within Article 2B. I move that the Board find that the license subject to this transfer request is a Class B, Beer and Wine on sale license issued by this Board to Thomas F. McKay, Elizabeth Johnson and Susan Jones by way of conversion of class of license on or about July 22, 2010 thereby making it subject to the general prohibitions contained within

6

Section 9-102(a). For the preceding findings I move that the request by Thomas F. McKay, Elizabeth Johnson and Susan Jones to transfer location of its license to the Lusby Food Lion be denied.

After the Board adopted these findings, Woodburn's sought review of this decision in the circuit court.

## 3. Proceedings in the Circuit Court

Woodburn's petitioned for review in the circuit court. The court took additional evidence and subsequently issued a written opinion and order upholding the Board's action. The opinion authored by Judge James Lombardi noted:

> Overriding this case is the applicability of a statute that provides a grandfather clause contained in Article 2B Section 9-102(a-1). For purposes of this case, this clause provides that a Class A license may not be granted or transferred to any supermarket unless the business establishment seeking the transfer is "already holding such a license or the possibility of such licensee having the license transferred to a similar type of business establishment." Therefore, two conditions must be met in order to avail the Petitioner of the protection of the grandfather clause.
>
> Petitioner contends that the history of the Board's actions in granting his business a freedom of interchanges between Class A and B licenses places him squarely within the contemplation of the statute and the exemption set forth in the grandfather clause. In short the Petitioner argues that it is immaterial as to whether his current license was Class B or Class A. The Board disagreed and held that holding a Class A license was a prerequisite to its approval; that the only license that the statute grandfathered was, in his case, a Class A license; and that since he held a Class B license he was required to apply for a completely different class of license.
>
> The second condition of the grandfather clause is that the license

7

had to be transferred to a similar type of business establishment. Although the evidence before the Liquor Board showed that the transferor was a small foodmarket and the prospective transferee a large supermarket, the Petitioner contends that the Board never addressed this condition. Similarly, neither the Board nor the other opponent to the transfer addressed this condition. Accordingly, the Petitioner contends that neither should the Court in its judicial review.

The court's opinion went on to conclude:

The Liquor Board did address the "similar business type" condition. Perhaps not artfully, but as the Court reads the Board's (short) motion disapproving the transfer, the Board made two distinct findings of fact: "I move that the Board find that the Lusby Food Lion is in fact a supermarket as defined within Article 2B. I move that [sic] Board find that the license subject to this transfer request is a Class B Beer and Wine on sale license . . . thereby making it subject to the general prohibitions contained within section 9-102(a-1)."

Accordingly, the Court need not address the Petitioner's (and apparently, the opposition's) principal argument as to the differences, *vel non*, between a Class A and Class B license because the Court finds substantial evidence that the Board denied the license because it found that the transferee was a supermarket and therefore outside of at least one condition of the grandfather clause.

Woodburn's appealed the June 15, 2012 order of the circuit court.

## QUESTIONS PRESENTED

Woodburn's poses the following questions for our review:

1. Did the Calvert County Board of License Commissioners err in determining that the conversion of the original license owned by Woodburn's Beverage issued in 1945 to Class B, Beer and Wine in 2010 effectively terminated the original license and created a new license for

8

Woodburn's Beverage?

2.     Did the circuit court err in failing to address the finding that the Calvert County Liquor Board erred in its interpretation of Annotated Code of Maryland Article 2(B) Section 9-102(a)(1)?

The Board and Patuxent have a different formulation of the issues:

1.     Was the Board of License Commissioners for Calvert County correct in denying the application for a Class A (off-sale) beer and wine license that the appellant Woodburn's Beverages proposed to use in conjunction with and on the premises of a Food Lion supermarket, based on a finding that Food Lion is a "chain store" and "supermarket" of the type included within the prohibition set forth in section 9-102(a-1) of Article 2B, when the facts of record showed that the "grandfathering" exception in section 9-102(a-1) was not applicable?

2.     Was the Board of License Commissioners correct in concluding that even if the appellant could otherwise take advantage of the "grandfathering" exception in section 9-102(a-1), the exception does not apply if there is a change in the classification of the alcoholic beverage license?

3.     In affirming the Board's denial of the appellant's application, did the Circuit Court correctly conclude that the issue relating to a change in the classification of the alcoholic beverage license did not need to be considered, because, quite apart from that issue, the evidence before the Board showed that the prerequisite for avoiding the prohibitions in section 9-102(a-1) were not met?

For the following reasons, we side with the Board and uphold its decision to reject

Woodburn's application to transfer its license to the Food Lion.

9

**DISCUSSION**

**1.      Standard of Review**

In liquor board cases, as in other judicial reviews of administrative agencies, we examine the decision of the board, not the circuit court. *Dakrish LLC v. Raich*, 209 Md. App. 119, 141 (2012). Our role is limited to determining whether there was substantial evidence to support the agency's findings and to assessing whether the administrative decision was premised upon an erroneous conclusion of law. *Id*. at 141-42. We review the board's decision in the light most favorable to the agency since its actions are *prima facie* correct and presumptively valid. *Id*. at 142. However, questions of law, such as the interpretation of a statute, are reviewed *de novo*. Finally, the Court will review the Board's "decision solely on the grounds relied upon by the agency." *Department of Health & Mental Hygiene v. Campbell*, 364 Md. 108, 123 (2001).

**2.      Basis for the Board's Decision**

The parties disagree sharply over the grounds for the Board's decision. Woodburn's argues it was confined to the purely legal issue of whether the grandfather clause of § 9-102(a-1) of Article 2B is rendered inapplicable when a license classification has changed. The Board and Patuxent contend - - and the circuit court agreed - - that the Board also decided the partially factual issue of whether under § 9-102(a-1), Woodburn's sought to transfer the license to "a similar type" of business establishment, an issue contested before the Board. *See* pp. 5-6, *supra*. The motion of Board member Swoap is murky on the point.

10

The motion referenced § 9-102 and both issues are related, if not entwined. The evidence before the Board clearly invited comparison between Woodburn's and Food Lion. In our view, in light of the presumption of validity accorded the agency action, we believe it is the better course to read the Board's decision as embracing both of these issues. Thus, we will answer both questions.

**3.     The Demise of Woodburn's Food Market**

Despite all the energy spent by the parties on the issue of whether and when Woodburn's was a supermarket, the record makes it abundantly clear that the licensee was not even a food market in June 2011 when it applied to transfer to the Food Lion - - which was unquestionably a supermarket/chain store - - a license it had never previously held.[8] Woodburn's had lost its lease and ceased regular hours in April. It remained open only to liquidate its inventory. And at the present time, it is completely closed. It seems odd that § 9-102(a-1) would authorize such a transfer. Nevertheless it is Woodburn's contention that none of this matters. It presently holds one of the licenses enumerated in the statute and held one of those licenses when the grandfather provisions were added to the law in 1962 and 1978. Woodburn's argues that the grandfather clause in these enactments does not "require a supermarket to supermarket transfer (although that is what exists in this case)." Regardless of the demise of Woodburn's Food Market, we will consider the legal correctness of these

---

[8]Although Woodburn's was licensed to sell beer off-sale and wine on-sale, it had never obtained the more coveted privilege of selling both beer and wine for consumption off the premises.

11

arguments.[9]

## 4.    The Parameters of § 9-102(a-1)

At the outset, we reject Woodburn's contention that the grandfathering authorized by § 9-102(a-1) applies to transfers from any business operating in 1962 or 1978, not just to those from a chain store/supermarket/discount house. The statute uses the term "business establishment" three times. The first and third times,[10] there is no doubt that the reference is to a chain store/supermarket or discount house. Woodburn's would ascribe a broader meaning to the law's second use of the same phrase. Textually, this makes no sense.[11]

In our view, the first sentence of § 9-102(a-1) was "intended to prohibit stores - - such as chain stores, supermarkets, or discount houses - - from obtaining liquor licenses." *Bd. of License Comm'rs of Carroll Cnty. v. Pizza Hut of Md., Inc.*, 95 Md. App. 291, 302 (1993). The second sentence grandfathers the very same types of establishments that already held liquor licenses.[12] And those licensees must have held their license on the effective date of

---

[9]The Board also did not premise its decision on the closing of Woodburn's Food Market.

[10]Woodburn's argues that the third reference to "a similar type of business establishment" expands the exemption to businesses that are not the three types enumerated in the statute. This seems like a quite implausible reading of the intent of this largely prohibitive legislation. The word "similar" was probably used rather than "identical" because the provision covers three types of businesses.

[11]The title to Chapter 991 of the *Laws of 1978* uses the term "business establishment" just once and only in language tied to the premises of the three enumerated business entities.

[12]In the First Reader version of SB 970, the phrase, "business establishment" was

(continued...)

the 1962/1978 legislation.[13]  In Part 6, *infra*, we will look at Woodburn's status on both dates.

**5.      Impact of Changes in Class of License**

Woodburn's argues that the changes in the class of its licenses over the years have no

impact on its right under § 9-201(a-1) to transfer to the Food Lion the license it now holds.

At the outset, there are problems with this proffered interpretation.  The Attorney General

has long advised that any application for renewal "either increasing or decreasing the class

---

[12](...continued)
modified by the terms "OF THE TYPE COMMONLY KNOWN AS CHAIN STORES, SUPERMARKETS, OR DISCOUNT HOUSES."  The capitalized language was deleted by amendment.  While this omission might theoretically support Woodburn's position, the title of the bill does not reflect any substantive change as to the type of establishments affected by the legislation.  *See Barrett v. Clark,* 189 Md. 116, 127 (1947) (A statute can be given no more extended operation than that explained in the title).  The only part of the title that could encompass this language change is "clarifying language."  This is a weak reed to support Woodburn's reading of § 9-102.

[13]An intriguing question is which, if any, of these two grandfathering dates applies to Woodburn's.  The 1962 legislation applied to the enumerated establishments with a "Class A, B or D beer, wine *and* liquor license."  (Emphasis added).  Chapter 99, *Laws of 1962.*  If this provision affected only those establishments entitled to sell all three types of alcoholic beverages, it would not have applied to Woodburn's, which in 1962 had just a beer license. The 1978 amendments to the chain store/supermarket law essentially changed the "and" to an "and/or" to make it clear that the statutory prohibition applied to each type of alcoholic beverage sold.  A Fiscal Note to the legislation (SB 970) dated March 17, 1978 stated that the bill "clarifies" certain provisions.  A note handwritten by an unknown person on the First Reader version of the Senate Bill (contained in the legislation file) said that the pre-1978 law was "[o]riginally thought to include every one."  The remainder of the committee file is not instructive. The Senate Economic Affairs Committee, then-chaired by Senate Harry J. McGuirk*,* considered the 1978 legislation.  It was probably the only legislative committee at the time to take detailed notes about what transpired in committee.  Unfortunately, they are written in a shorthand that is virtually indecipherable.  *See* Jack Schwartz and Amanda Stakem Conn, *The Court of Appeals at the Cocktail Party: The Use and Misuse of Legislative History*, 54 Md. L. Rev. 432, 446 n.59 (1995).

13

of beverage the licensee is authorized to sell must be treated as an original application." 43 *Opinions of the Attorney General* 81, 82 (1958). An on-sale license where beer may be consumed with food is not the same as a beer and wine retailer. In short, categories of licenses are neither equivalent nor fungible.

In addition, absent from § 9-201(a-1) is language found in at least two other local chain store/supermarket laws that expressly authorize grandfathered licenses to change the class of their licenses. *See e.g.,* Article 2B, § 9-213(f)(1) ("Those establishments holding an alcoholic beverages license on July 1, 1976 may continue to hold that license, or apply to upgrade to Class A-1 or A-2"); § 9-217(h)(1) ("However, those establishments holding an alcoholic beverage license at the time of the enactment of this section may continue to hold such license, and may, at the discretion of the Board of License Commissioners, change the classification of their license."). In *Food Lion, Inc. v. McCall*, 122 Md. App. 429, 436 (1998), in contrasting the language in what is now § 9-201(a-1) with a local chain store/supermarket law, this Court applied the doctrine of negative implication often called *inclusio unius est exclusio alterius* (The inclusion of one is the exclusion of the other).

Woodburn's argues that its position is supported by this Court's decision in *Food Lion, Inc. v. McCall*. There, a supermarket holding a Class A (off-sale) beer and wine license and operating at several locations in Prince George's County since 1956 sought to transfer it to a Food Lion. 122 Md. App. at 432. We held that the transfer was governed by a local provision that precluded a transfer, rather than what is now § 9-102(a-1). *Id*. at 435-

14

36. Woodburn's claims that this decision suggests that the transfer would otherwise have been permitted under the state-wide statute and that it is in an identical position to the licensee in *McCall*. However, there is no indication in *McCall* that the supermarket ever changed its license from Class A to another class - - an action, in any event, that would have been expressly permitted under the Prince George's chain store/supermarket law. *Id*. at 434.

Another major contention of Woodburn's is that if the Board is correct, it violated § 9-102(a-1) each time it authorized a change in the license for what Woodburn's asserts was a supermarket. However, there was no showing before the Board that the issue of compliance with the chain store/supermarket law ever arose on these prior occasions or that a post-1962 transfer to a chain store like Food Lion sparked the issue. More importantly, any long-standing administrative interpretation or practice or laxity in enforcement that is contrary to the clear and unambiguous language of a statute cannot be given effect. *See Salisbury Beauty Schools v. State Bd. of Cosmetologists*, 268 Md. 32, 66-67 (1973); *see also Hecht v. Crook*, 184 Md. 271, 283 (1945) (A State agency has no "authority to extend the benefits of [a statute] to persons ineligible thereto."). For these reasons, we believe the better interpretation of § 9-102(a-1) is that a change in the class of license by a business grandfathered in 1962/1978 removes the licensee from the exemption and subjects the business to the chain store/supermarket prohibition. Therefore, the Board did not err in

15

denying Woodburn's transfer request on this basis.[14]

## 6. Transfer to a Similar Type of Business Establishment

Even were we wrong about the application of § 9-102(a-1) to business establishments that change their license classification, we would be obliged to uphold the Board and affirm the circuit court on the alternative ground that the proposed transfer would not have been made to a "similar type of business establishment."

We have already rejected Woodburn's contention that the focus of the transfer provision is the near-present, when Woodburn's was operating at its highest and best use and we are not addressing the immediate present, when it is not operating at all. Aiming our sights at 1962, we note that Woodburn's was a small food store or food market with 6000 square feet and a beer license. Although evidence is lacking as to the precise size in 1978, at the time of its relocation in 1988, its size was still under 10,000 square feet. Thus, it is clear that in 1978, the size of the premises was still 6000 - 10,000 square feet. It still held only a beer license. Thus, the only evidence in the record is that Woodburn's was a small but growing food store or food market at the time of any grandfathering. But even if we move back to the future to 2010, when the business - - still just one store - - had grown to 16,000 square feet, Woodburn's was not comparable to the Food Lion in Lusby, which was 39,000

---

[14]Because we conclude that the Board was correct in its application of § 9-101(a-1), we need not address Woodburn's contention that the circuit court erred in not reaching the issue.

square feet and undoubtedly a chain store with 1300 stores. Without focusing on all conceivable points of comparison between the two businesses, or even the troubling facts about the proposed absorption of Woodburn's alcoholic beverage business into Food Lion's operation, we believe the above facts show that there was substantial evidence to support the Board's implicit finding that the transfer was not consistent with § 9-102(a-1). In short, the Food Lion was not a similar type of business establishment to Woodburn's, whether in 1962, 1978 or 2010.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**